Stephen M. Estey and Harry Rockefeller, Plaintiffs, *v.* Oliver Coleman, Individually and as President of the Village of Ilion, and Others, Defendants.

Supreme Court, Herkimer County, July 29, 1940.

*Ribyat, Walsh & Myers* [*John J. Walsh* of counsel], for the plaintiffs.

*Albert Schneider*, for the Village of Ilion, N. Y.

CROSS, J.   This is a motion for a temporary injunction restraining the president, board of trustees, police justice and chief of police of the village of Ilion, N. Y., from " interfering with plaintiffs' right to distribute leaflets, pamphlets, or handbills on the public streets and thoroughfares of the Village of Ilion, New York in connection with the organizational drive of the American Federation of Labor among the employees of the Remington Rand Company and from attempting to enforce an Ordinance of the Village of Ilion passed the 16th day of September, 1925, entitled ' An Ordinance restricting the distribution, posting or painting of advertising matter.' "

The complaint alleges that the plaintiff Estey is a grand lodge representative of the International Association of Machinists and that, as representative of this organization, he is in charge of a campaign of organization among the employees of the Remington Rand Company of Ilion, N. Y., and that the plaintiff Rockefeller, under his direction, distributed certain handbills to the employees of said company.

It further appears by the complaint that plaintiff Rockefeller was arrested on the 17th day of July, 1940, by the chief of police of said village who informed him that the distribution of these handbills violated an Ilion village ordinance, which by its terms made such acts a misdemeanor punishable by a fine not exceeding fifty dollars for each offense and that he would arrest persons for distributing these pamphlets in the future.   Upon arraignment before the police justice, Rockefeller appeared by counsel and moved for a dismissal of the information on the ground that the ordinance was invalid and in violation of the State and Federal Constitutions. This motion was denied.   Rockefeller was found guilty of violating the ordinance and was fined the sum of ten dollars.   The precise information upon which the warrant was issued does not appear in the record on this motion, although it does appear that Rockefeller was charged with a violation of the village ordinance.

A variety of acts, running the gamut from painting advertising matter on a fire hydrant to distributing handbills for purposes of

advertising, are prohibited by the ordinance. Most, if not all, of these provisions have no relation to plaintiffs' conduct preceding the arrest, according to the uncontroverted record before the court. The first question which arises on this motion relates to the applicability of the provision of the ordinance which defendants applied to the conduct for which Rockefeller was arrested.

A consideration of the diverse acts proscribed by the ordinance makes it clear that no provision has even an arguable relationship to plaintiffs' stated conduct, save the one which provides that " * * * it also shall be unlawful for any person to distribute, throw, drop or scatter or cause to be distributed, dropped or scattered on any street or public place in the city, any posters, handbills, advertising cards or other substances used for the purpose of advertising." The pamphlet or handbill involved reads as follows:

### " IT IS UP TO YOU.

" Authoritative sources reveal that 1200 local residents have left Ilion and vicinity during recent months because of short time employment or because of unsatisfactory employment conditions.

" Since the typewriter business of Remington Rand competitors shows evidence of higher production than was enjoyed by Remington Rand, it is only logical to assume that the unsatisfactory relationship between the Company and 'organized labor, which has continued for several years, contributes to present unemployment in the Typewriter Division.

" Representatives of Remington Rand, at the Company's exhibit at the World's Fair in New York revealed the fact that about one-third of the visitors to the exhibit in 1939 had taken the general stand that, ' We like your products but would not purchase them because of your Company's labor policies.'

" In view of that attitude by prospective customers it is logical to assume that a resumption of decent contractual relations with organized labor would result in greatly increased business for the Company and a greater degree of prosperity for its employees and the communities where Rand Plants are located.

" THE PRESENT ORGANIZATION DRIVE OF THE A. F. OF L. UNIONS IS SHOWING SUBSTANTIAL RESULTS BUT WE ARE NOT SATISFIED WITH A MERE MAJORITY. THE MOST EFFECTIVE RESULTS FROM ORGANIZATION CAN BE ACHIEVED ONLY THROUGH THE MOST COMPLETE PARTICIPATION OF ALL EMPLOYEES.

" The A. F. of L. is ready and willing to place its influence and resources at your disposal to improve conditions. We have brought

to your attention many of the achievements of the past, many of which have been sacrificed during the past four years.

" The A. F. of L. is also willing to assist in stimulating the extension of the Company's business throughout the length and breadth of America as soon as the Company cooperates in re-establishing the fair and decent labor standards which are the right of all workers under our National and State Laws.

" Dual Unionism or engineered division of workers by the setting up of employees associations has resulted in four years of lowering labor standards in Remington Rand Plants at the time when the vast majority of workers in our country were making the greatest progress in industrial history.

" All employees, especially former Norwood and Syracuse workers are cordially invited to attend the regular weekly mass meeting Thursday evening, July 18 at 8 p. m. to hear and meet your old friend, Sam Newman, and other speakers, including A. F. of L. Attorney and Special Representative, John Buaby, former President of the Alabama State Federation of Labor.

" Together we can go forward and carry ourselves and Remington Rand to greater prosperity. Divided we stagnate. Let us all aid in stemming the exodus of our people from Ilion by working to provide better conditions, better wages and more employment through return to A. F. of L. affiliation, and a satisfactory working agreement with Remington Rand.

" Sign an Application Blank

" OFFICE EQUIPMENT WORKERS' ORG. COMMITTEE———AFL
Capitol Theatre Bldg., Otsego St., Ilion, N. Y.

" Office open daily after 4:00 p. m. and Saturday all day. Open meetings every Thursday at 8:00 p. m."

The plaintiffs maintain that the ordinance in question, as applied to the plaintiffs' conduct, is void on its face and in violation of the First and Fourteenth Amendments to the Constitution of the United States and of section 8 of article 1 of the Constitution of the State of New York. These are the constitutional provisions which, among other things, prohibit the making of a law which abridges the freedom of speech or of the press.

In the cases of *Schneider* v. *State, Young* v. *California, Snyder* v. *Milwaukee,* and *Nichols* v. *Massachusetts,* reported among the opinions of the United States Supreme Court for the October term, 1939 (308 U. S. 147), the Supreme Court of the United States upheld the constitutional rights of persons to peaceably distribute pamphlets upon the streets. Before these cases were decided, it was held in *Lovell* v. *City of Griffin* (303 U. S. 444 [1937]), Mr. Chief

Justice HUGHES writing the opinion, that constitutional guaranty of freedom of the press is not confined to newspapers and periodicals, and necessarily embraces pamphlets and leaflets. It was there held that the constitutional guaranty of freedom of the press embraces distribution as well as publication. In the cited case of *Schneider* v. *State* (*supra*) the Supreme Court discussed the rule by which the constitutionality of an ordinance seeking to restrict the distribution of handbills or pamphlets upon public streets shall be determined in the following language:

" The freedom of speech and of the press secured by the First Amendment against abridgment by the United States is similarly secured to all persons by the Fourteenth against abridgment by a State.

" Although a municipality may enact regulations in the interest of the public safety, health, welfare or convenience, these may not abridge the individual liberties secured by the Constitution to those who wish to speak, write, print or circulate information or opinion " (p. 160).

The court pointed out in these cases that the primary purpose of streets is for the movement of people and property and that there is a limit to the exercise of the liberty of circulating pamphlets by a person standing in the street and maintaining a position to the stoppage of all traffic, contrary to traffic regulations and furthermore that a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet and that the municipality, likewise, has the right to adopt regulations against throwing literature broadcast in the streets.

Again the court said: " Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights " (p. 161).

Now, taking up the task of weighing the circumstances and appraising the reasons advanced in support of the applicability and constitutionality of the ordinance in the instant case, as applied to plaintiffs' stated conduct, the court is confronted with a delicate but not a difficult task.

The circumstances disclosed by the instant record are that plaintiff Rockefeller peaceably distributed pamphlets on East Main street

in Ilion, N. Y., in front of Plant 3 of the Remington Rand Company. The reason advanced by the defendants on the oral argument in support of the provision of the ordinance invoked against Rockefeller was the prevention of street littering.

The United States Supreme Court in *Schneider* v. *State* (308 U. S. 147) definitely held that a municipal ordinance which prohibits persons rightfully on a public street from handing literature to one willing to receive it, violates the constitutional right of freedom of speech and of the press, even though it is enforced only if those who receive printed matter throw it away in the street. On the record before the court on this motion, plaintiffs' stated conduct comes squarely within the holding of the United States Supreme Court that it is not unlawful. No distinction is apparent between the peaceable delivery of a pamphlet, such as the one involved here, to a person willing to receive it, and the delivery and receipt of a newspaper, under like circumstances. Said Mr. Chief Justice HUGHES in *Lovell* v. *City of Griffin* (303 U. S. 444, 452): " The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."

The instant ordinance is not limited to handbills that are offensive to public morals or that advocate unlawful conduct. There is no suggestion that the handbill, in the instant case, was of that character. The distribution of handbills is not limited, by the ordinance here attacked, to ways which might be regarded as inconsistent with the maintenance of public order or as involving disorderly conduct, the molestation of the inhabitants or the misuse or littering of the streets.

It is clear that the provision of the ordinance invoked here is void on its face as applied to plaintiffs' stated conduct.

Having reached the conclusion that the ordinance, as applied to plaintiffs' stated conduct, is void on its face, it is now in order to take up the question of whether a temporary injunction should issue. The proper solution of this question presents considerations not involved in the determination of the constitutionality of the ordinance.

In the case of *Buffalo Gravel Corp.* v. *Moore* (201 App. Div. 242; affd., 234 N. Y. 542) the court quoted with approval from *United Traction Co.* v. *City of Watervliet* (35 Misc. 392), which was an action to restrain city officials from enforcing a void ordinance,

and pointed out the distinction between the propriety of enjoining the prosecution of a criminal action which has already been instituted and enjoining the enforcement of a void municipal ordinance, at the instance of a person not under arrest, or who is not threatened with arrest. In the instant case one of the plaintiffs has already been arrested and the other plaintiff is in the position of one threatened with arrest for violation of the ordinance. In the case last cited the court stated that a person charged with the violation of an unconstitutional statute has three remedies at law, namely, by motion to dismiss, by habeas corpus or by plea. Said Mr. Justice HUBBS, writing for the court in *Buffalo Gravel Corp.* v. *Moore* (*supra,* p. 244): " Persons who are threatened with damage to property rights and irreparable injury by the threatened enforcement of a void ordinance have no redress, before arrest or indictment, except an action in equity to restrain the enforcement of such void ordinance, but a person who has been arrested or indicted for violating such ordinance has a complete and adequate remedy." The same rule is stated in *Biddles, Inc.,* v. *Enright* (239 N. Y. 354, 367) where Judge CRANE, writing for the court, said: " There are, however, numerous instances where a statute or an ordinance of a criminal nature is such an unlawful interference with the rights of property that courts of equity will restrain its enforcement in order to prevent irreparable damage." (Citing cases.)

But the same judge in *Reed* v. *Littleton* (275 N. Y. 150, 157), then Chief Judge of the Court of Appeals, referring to criminal prosecutions not involving property rights, said: " No doubt criminal prosecutions are always annoying and may disarrange the defendants' income and finances but never yet has this been sufficient to change the usual and customary course of prosecutions for crime."

In that case the court took occasion to refer to the obvious danger consequent upon enjoining criminal trials upon certain or uncertain facts which constitute a crime.

It may seem on superficial reflection that the intervention of a court of equity for the protection of property rights against irreparable damage, indicates that the sacred right of liberty involved in the enforcement of the criminal law, is regarded as of less consequence than the right of property. Such reasoning, however, is untenable. The converse of this thesis is apparent upon more careful reflection. The individual is dependent for his liberty, as that term must be realistically interpreted in an organized society, upon the due and true administration of the law. A minimum of interference with the uniform administration of the criminal law is as vital to the security of the individual as a component unit of a

composite society as it is to the security of society as a whole. Society is organized and laws result because they are essential to the maintenance of ordered liberty. The immediate benefits derived by the individual in the abbreviation of formal procedure, are more than offset by the general effect. The price of frequent interference with the orderly steps prescribed for the enforcement of the criminal law is the surrender of liberty to the whim or caprice of one exercising absolute power.

In *Delaney* v. *Flood* (183 N. Y. 323, 328, 329) the court said: " An innocent person, upon an accusation of crime, may be arrested and ruined in his character and property, and the damage he thus sustains is *damnum absque injuria,* unless the case is such that he can maintain an action for malicious prosecution or false imprisonment. He is exposed to the risks of such damage by being a member of an organized society and his compensation for such risks may be found in the general welfare which society is organized to promote."

As bearing upon the judicious exercise of judicial power in granting a temporary injunction in the instant action, the court is conscious of the practical duty resting on the defendants of maintaining total law enforcement. Frequently overlapping and conflicting allegations and proof present delicate questions as to whether facts inextricably intermingled constitute a violation of one or more valid laws.

On the record here the court does not have the benefit of the definite allegations of the information nor of the proof upon the trial. In an application to punish for contempt of court under such an injunction, if issued, occasion would arise for the appraisal of factors which would be difficult to define short of the searching scrutiny implicit in a fair trial.

This application for a temporary injunction comes before the court on a state of facts arising from two fundamental bases: *First,* in the nature of a controversy arising from the right of freedom of speech and of the press; *second,* a controversy arising out of conduct that contains the seeds and substance of a labor dispute as that term is defined by section 876-a of the Civil Practice Act.

The wage earner in the age-old struggle for betterment of his economic condition, requires the safeguard of the Constitution to enable him to discuss and to disseminate information on social and economic questions that directly affect his well-being. In another day when labor was less able to effectively present its cause and persuade the employer into a more just and fair relationship, injunctions were frequently employed to still the voice and palsy the hand of the worker. Legislative recognition of this injustice finally found its way into the statute books of this State in chapter

477 of the Laws of 1935, which added section 876-a to the Civil Practice Act. The Legislature declared in

" Section 1. The policy of this State is declared as follows: Equity procedure that permits a complaining party to obtain sweeping injunctive relief that is not preceded by or conditioned upon adequate notice to and hearing of the responding party or parties, or that issues after hearing based upon written affidavits alone and not upon examination, confrontation and cross-examination of witnesses in open court, is peculiarly subject to abuse in labor litigations for the reasons that among other things

" (1) The *status quo* cannot be maintained but is necessarily altered by the injunction,

" (2) Determination of issues of veracity and of probability of fact from affidavits of the opposing parties that are contradictory and, under the circumstances, untrustworthy rather than from oral examination in open court is subject to grave error,

" (3) Error in issuing the injunctive relief is usually irreparable to the opposing party, and

" (4) Delay incident to the normal course of appellate practice frequently makes ultimate correction of error in law or in fact unavailing in the particular case."

The public policy of this State as declared in that statute is analogous in principle to the underlying facts here and is entitled to weight as the court proceeds to fix the values that should be considered in allowing or denying this application.

Indeed, this germane principle may well distinguish the decision on this motion from the wilderness and confusion of precedents on the broad subject of temporary injunctions.

Furthermore, in addition to the remedies at law pointed out in *Buffalo Gravel Corp.* v. *Moore* (201 App. Div. 401), there are the added remedies at law of an action for malicious prosecution, as well as the remedy under section 854 of the Penal Law, which latter remedy makes it a misdemeanor for public officers, under pretense or color of official authority, to unlawfully and maliciously injure persons in their property or rights or to commit oppression.

Careful consideration of the appropriate precedents and the difficulty of balancing equities which must condition the issuance of an injunction restraining the enforcement of a statute or ordinance, constrain the court to the conclusion that injunctive remedy herein, should await the sanction of final judgment.

Motion is denied without costs.

Enter order accordingly.