**CHRESTENSEN v. VALENTINE.**

No. 358.

Circuit Court of Appeals, Second Circuit.

July 25, 1941.

Writ of Certiorari Granted Nov. 24, 1941.

See —— U.S. ——, 62 S.Ct. 301, 86 L.Ed. ——.

See, also, 34 F.Supp. 596.

Walter W. Land, of New York City (Winthrop, Stimson, Putnam & Roberts, of New York City, on the brief), for plaintiff-appellee.

William S. Gaud, Jr., Asst. Corp. Counsel, of New York City (William C. Chanler, Corp. Counsel, and Paxton Blair and William B. Trafford, Asst. Corp. Counsel, all of New York City, on the brief), for defendant-appellant.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This case presents another aspect of the much litigated question as to the validity of municipal prohibitions against the distribution of handbills in streets and public places. Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; Hague v. C. I. O., 307 U.S. 496, 518, 59 S.Ct. 954, 83 L.Ed. 1423. The prohibition here involved is found in New York City Sanitary Code, § 318 (Health Department Regulations, Art. III, § 318), but with a saving sentence limiting its application to "commercial and business advertising matter." Upon this limitation the defendant city police commissioner rests his case herein, since he regards plaintiff's handbills as commercial advertising. But on application for an injunction pendente lite, the district court held the regulation entirely invalid in an opinion reported in 34 F.Supp. 596, 598, though not of record here, notwithstanding Federal Rule 75(g), 28 U.S.C.A. following section 723c. And after a hearing on the merits wherein the facts were stipulated, the court entered its decree perpetually enjoining defendant from enforcing the regulation as against distribution of plaintiff's handbills. This appeal followed. A further contention involving a city park regulation was decided adversely to plaintiff and is not the subject of appeal.

FRANK, Circuit Judge, dissenting.

————◆————

Plaintiff, a citizen of Florida, is the owner of the former U. S. Navy Submarine S-49, "a $2,000,000 fighting monster," as his handbill asserts. He has exhibited this submarine in various cities, and in 1940 applied to the city for permission to dock at city-owned docks off Battery Park. This was refused, apparently because permission had been denied other boats to operate as night clubs, restaurants, and dance halls. Plaintiff then secured permission to dock at a state-owned pier in the East River and thereupon prepared handbills to advertise the submarine as docked at Pier 5, East River, two minutes away from Battery Park. This draft of handbill was a direct bid for patronage. It contained a cut of the submarine, a statement that competent guides would take a person from one end of it to the other, insistent directions to see several featured points—the torpedo compartment, the sleeping quarters, the kitchen, and finally "See how men live in a Hell Diver"—and a schedule of "popular prices" (adults 25¢ and children 15¢). Defendant or his agents having informed plaintiff that distribution of this handbill would be illegal, but that bills containing only information or a public protest could be distributed, plaintiff revised his material to the form which is the subject matter of this suit.

In its final form much of the material of the first handbill was preserved; included was the cut of the submarine and the map showing the approach to Pier 5 in the East River opposite Battery Park; but elided were all references to the sale of tickets or the price thereof. In place of the schedule of prices appeared the statement, "The only submarine used for exhibition in the world"; instead of the insistent commands to "see" the described points of interest were only the drab statements that "Submarine S-49 contains" the torpedo compartment, the sleeping quarters, the kitchen, etc.; and the invitation to see life in a hell diver vanished entirely. On the reverse side of this bill appeared four paragraphs of rather closely spaced type, over plaintiff's name as "Exhibitor of the former U. S. Navy Submarine S-49" and under the title, "Submarine Refused Permission To Dock At Any City Owned Pier By Commissioner of Docks McKenzie." Herein appeared a spirited protest against the "almost unbelievable" action of "dictatorial" subordinates of "a mayor who is one of the outstanding liberals of the United States" in refusing plaintiff permission to tie up to city-owned piers, contrary to his treatment in many other named cities. The protest concluded with the statement that it was only because the State of New York allowed plaintiff the use of Pier 5 in the East River that the people of New York were now able to see this submarine. "While not as convenient for the visitors as Battery Park, by following the diagram on the other side of this paper, it may be reached in about two (2) minutes."

Defendant's agents, being shown a printer's proof of this handbill, still asserted its illegality, but told plaintiff that the protest appearing on its reverse side could be distributed without police restraint if separated from "the commercial advertising matter" remaining on the face. Plaintiff nevertheless caused the handbill to be printed, defendant restrained its distribution, and plaintiff brought this action for an injunction. Jurisdiction rests upon diversity of citizenship of the parties, there being more than $3,000 involved, and also upon the deprivation of a constitutional right. 28 U.S.C.A. § 41(1) and (14); Hague v. C. I. O., supra.

Defendant's claim is that the face of the handbill constituted commercial or business advertising matter within the interdiction of the city ordinance or regulation. This enactment in some analogous form goes back for many years. In 1938, it was transmuted into the present health department regulation, and the important second or final sentence was added to make the entire provision read as follows:

"*Handbills, cards and circulars.*—No person shall throw, cast or distribute, or cause or permit to be thrown, cast or distributed, any handbill, circular, card, booklet, placard or other advertising matter whatsoever, in or upon any street or public place, or in a front yard or court yard, or on any stoop, or in the vestibule or any hall of any building, or in a letter box therein; provided, that nothing herein contained shall be deemed to prohibit or otherwise regulate the delivery of any such matter by the United States postal service, or prohibit the distribution of sample copies of newspapers regularly sold by the copy or by annual subscription. This section is not intended to prevent the lawful distribution of anything other than commercial and business advertising matter."

Without the last sentence, either expressed or implied, it seems quite clear that

the regulation is invalid under the Supreme Court cases cited, as abridging the freedom of speech and of the press secured against state invasion by the Fourteenth Amendment of the Constitution. Since the claimed purpose of the regulation is to protect public health by preventing the littering of streets, it might be doubted whether the regulation thus truncated accomplishes enough to be worth saving. The city officials, however, support the regulation as limited, on the ground that partial prevention of street littering is better than none at all.[1] Moreover, they view the 1938 limitation as merely embodying previous state judicial rulings and as bringing about a discriminating type of handbill regulation which is within the Supreme Court precedents.

So far as State judicial history is concerned, there is authority for their position, although, as we view it, rather less persuasive or compelling than their argument presupposes. The prohibition seems to have been pretty thoroughly upheld in the early case of People v. Horwitz, 1912, 27 N.Y.Cr.R. 237, 140 N.Y.S. 437, although in People v. Lookstein, 78 Misc. 306, 139 N.Y.S. 680, a conviction of the person furnishing the circulars as an abettor was reversed. In 1921, however, in People v. Johnson, 117 Misc. 133, 191 N.Y.S. 750, the court upheld the ordinance only by restricting it to commercial advertising and actually dismissed the complaint against the then defendant. Thereafter, until the recent case of People v. La Rollo, —— Misc. ——, 24 N.Y.S.2d 350, this regulation and similar city ordinances seem regularly to have been set aside, at least as to the persons actually before the court, with or without suggestion of the distinction made in the Johnson case. See Estey v. Coleman, 174 Misc. 780, 21 N.Y.S.2d 829; City of Rochester v. Parr, 165 Misc. 182, 1 N.Y.S.2d 771; People ex rel. Gordon v. McDermott, 169 Misc. 743, 9 N.Y.S.2d 795; People v. Ribinovich, 171 Misc. 569, 13 N.Y.S.2d 135; People v. DeJulis, 174 Misc. 836, 21 N.Y.S.2d 995.[2] A regulation requiring a license to sell merchandise was held invalid as applied to pamphlets in People v. Banks, 168 Misc. 515, 6 N.Y.S. 2d 41, not applicable to pamphlets in People v. Finkelstein, 170 Misc. 188, 9 N.Y.S. 2d 941, and valid as to song sheets, which were "essentially commercial" publications, in People v. Samuels, —— Misc. ——, 28 N.Y.S.2d 113. In Walters v. Valentine, 172 Misc. 264, 12 N.Y.S.2d 612, Justice McCook held invalid a regulation prohibiting advertising by sandwich men, but excepting pickets, even against the city's suggested distinction between commercial and noncommercial advertising.

Finally, after the decision below, came People v. La Rollo, supra, where the city magistrate did accept the distinction between commercial and noncommercial advertising as ground for upholding the present form of § 318. The court took pains, however, to distinguish our case here as on the border line between commercial advertising and protest, and hence not applicable to the case then before it.

With such a record of uncertainty as to the validity and effect of the regulation, with the further necessity—adverted to below—of making refined distinctions between circulars *"primarily"* commercial or otherwise and enterprises entered into *"primarily"* for commercial purposes to sustain the regulation and make it workable, the able Corporation Counsel and his skilled staff might well have paused before attempting to sustain only the remnants of the original prohibitory scheme; or might well have preferred to try their hand at the devising of an ordinance "narrowly drawn" (Cantwell v. Connecticut, 310 U.S. 296, 307, 311, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352) to secure at once

---

[1] It is suggested—rather blithely, we think—that commercial handbills will cause more street litter than noncommercial, as more quickly discarded—thus assuming that the public is more interested in political and religious discussion than in commercial bargains or amusement notices. Cf., however, Milwaukee v. Kassen, 203 Wis. 383, 385, 234 N.W. 352; People v. Young, 33 Cal.App.2d, Supp., 747, 85 P.2d 231; 39 Mich.L.Rev. 561, 589; but see Coughlin v. Sullivan, 100 N.J.L. 42, 126 A. 177.

[2] There seem also to have been several unreported decisions of like tenor. People ex rel. Horan v. Harry Goren, Mag. Ct., N.Y.C., 1935, 4 I.J.A.Bull., No. 3, p. 3; City of New Rochelle v. McCormick, City Ct., New Rochelle, 1935, 4 Westchester L.J. 99; People v. Lorenz & Ross, Mag.Ct., N.Y.C., 1933, 1 I.J.A.Bull., No. 12, p. 2. See, also, 3 ibid. No. 3, pp. 1, 2, No. 6, p. 3, No. 11, p. 2, No. 12, p. 2; 4 ibid. No. 3, p. 2; 5 ibid. 147–151; 6 ibid. 103; People v. Black, 135 Misc. 841, 241 N.Y.S. 756; People v. Goldstein, 150 Misc. 101, 268 N.Y.S. 50.

the legitimate objectives of the city without the chance of infringing on the cherished constitutional rights of the individual. That the city officers chose nevertheless to apply the regulation as against the plaintiff is due, we think, to a failure to accord due force to all the several rulings in Schneider v. State, supra.

After the decision in Lovell v. City of Griffin, supra, four state courts of high authority proceeded to uphold ordinances involving handbills on various grounds, in each case distinguishing Lovell v. City of Griffin. Three of these decisions involved *prohibition* against the distribution of handbills; while one concerned the *regulation* of canvassing and soliciting. This difference in the cases is important to an understanding of Schneider v. State, supra, which reversed all four cases. Of the three handbill cases, the most important here is the reversal of People v. Young, supra, for involved in that case was a handbill giving a notice of a meeting under the auspices of "Friends Lincoln Brigade," at which speakers were to discuss the war in Spain. On the handbill were the words "Admission 25¢ and 50¢." The state court said of this, as quoted by the Supreme Court, 308 U.S. at page 155, n. 3, 60 S.Ct. at page 148, 84 L.Ed. 155: "Whatever traffic in ideas the Friends Lincoln Brigade may have planned for the meeting, the cards themselves seem to fall within the classification of commercial advertising rather than the expression of one's views. But if this be so, our conclusion is not thereby changed." When, however, the Supreme Court rendered its decision in the handbill cases, it pointed out that none of them purported "to license distribution but all of them absolutely prohibit it in the streets and, one of them, in other public places as well." 308 U.S. at page 162, 60 S.Ct. at page 151, 84 L.Ed. 155. It was held that "the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it," that "there are obvious methods of preventing littering," such as punishment of those who actually throw papers on the street, and that all the ordinances were invalid. Hence it seems clear that a handbill containing advertising matter, even a schedule of admission charges, is not in itself rendered outside the pale of protection against such an absolute and complete prohibition.

The fourth case involved an ordinance of the City of Irvington, New Jersey, carefully drawn to protect and license the privilege of canvassing and soliciting. It was "not limited to those who canvass for private profit," but required generally a submission to the judgment of a police officer as to granting of the permit, fingerprinting, photographing, and so on.[3] The court held this ordinance invalid as against the petitioner, a member of Jehovah's Witnesses, who was distributing tracts. It went on to say, 308 U.S. at page 165, 60 S. Ct. at page 152, 84 L.Ed. 155: "We are not to be taken as holding that commercial soliciting and canvassing may not be subjected to such regulation as the ordinance requires. Nor do we hold that the town may not fix reasonable hours when canvassing may be done by persons having such objects as the petitioner. Doubtless there are other features of such activities which may be regulated in the public interest without prior licensing or other invasion of constitutional liberty."

Moreover, the Court now made express what previous decisions had implied, namely, that the explicit constitutional protection accorded freedom of expression made support of the legislative preference less imperative, but that, indeed, "the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." 308 U.S. at page 161, 60 S.Ct. at page 151, 84 L.Ed. 155; see 40 Col.L.Rev. 531. This admonition is repeated in almost identic words in Thornhill v. Alabama, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093, while the different rule applicable where more important sovereign rights are involved is contrasted in the "flag salute" case, Minersville School District v. Gobitis, 310 U.S. 586, 595, 60 S.Ct. 1010, 1013, 84 L.Ed. 1375, 127 A.L.R. 1493. In the latter case the court, referring to the interest there involved, national unity, which was the basis of national security, said: "To deny the legislature the right to select ap-

---

[3] See, also, the opinions below, Town of Irvington v. Schneider, 120 N.J.L. 460, 200 A. 799, affirmed 121 N.J.L. 542, 3 A.2d 609.

propriate means for its attainment presents a totally different order of problem from that of the propriety of subordinating the possible ugliness of littered streets to the free expression of opinion through distribution of handbills. Compare Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L. Ed. 155." See, also, Cox v. New Hampshire, 61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L. R. 1396.

■ We think, therefore, that interpretation of the conclusions of the Schneider case is not doubtful. Absolute prohibition of expression "in the market place" is illegal, not to be saved by any commercial taint attached to the expression; reasonable regulation of soliciting, not preventing freedom of expression, is permissible.[4] And in the latter case, where the soliciting is for profit, steps to identify, even to license, the solicitor may be upheld to prevent fraud upon or inconvenience to the public. (Note that this distinction between forms of solicitation may be made clear, definite, and workable, since it has a common-sense purpose in mind and deals with regulation, not prohibition; with it may be contrasted the distinctions hereinafter discussed.) And borderline cases are to be resolved not in favor of the regulation, but in favor of the cherished right.

To avoid the conclusion to which this reasoning necessarily points, defendant suggests a different interpretation of the governing precedents, resting upon certain assumptions and distinctions which he presses with vigor. First to meet the issue that handbills containing at least some advertising matter have been protected, he suggests that the prohibition does not apply unless the handbill is "primarily" commercial. On this ground he distinguishes People v. Taylor, 33 Cal.App.2d, Supp., 760, 85 P.2d 978, for there the circular supported as against the San Diego ordinance did contain advertising matter—of subscriptions to a daily paper, of books and pamphlets, and of a book store—but it was a "publication of a radical but not incendiary nature, mainly devoted to political discussion but containing certain advertising matter." 33 Cal.App.2d, Supp., at page 762, 85 P.2d at page 979. Again, it is suggested that a commercial advertisement is to be distinguished from a noncommercial advertisement—or matter "exclusively or primarily

calculated to attract the attention and patronage of the public to a non-commercial enterprise, i. e., one entered into primarily for considerations other than pecuniary gain." On this basis the Los Angeles handbill considered in Schneider v. State, supra, is denominated noncommercial. And so also are distinguished other cases holding broadly that such handbill ordinances are illegal. People v. Armstrong, 73 Mich. 288, 41 N.W. 275, 2 L.R. A. 721, 16 Am.St.Rep. 578; City of Chicago v. Schultz, 341 Ill. 208, 173 N.E. 276. Still other precedents are distinguished as applying merely to ordinances entirely vague or discriminatory against certain kinds of advertising only. Cleveland Shopping News Co. v. City of Lorain, 37 O.L.R. 527, 13 O.L.A. 265; In re Thornburg, 55 Ohio App. 229, 9 N.E.2d 516; Ex parte Johns, 129 Tex.Cr.R. 487, 88 S.W.2d 709; Ex parte Pierce, 127 Tex.Cr.R. 35, 75 S.W.2d 264. Thus a rather impressive array of judicial precedents is put aside, once we accept the assumptions urged upon us.

Perhaps we can pass the fact that the distinctions argued for are not explicitly stated in either legislation or decision (except perhaps in People v. La Rollo, supra), since the necessity of drawing lines, of making narrow distinctions, is so usual a part of interpretation and adjudication. But we still have the question as to the reasonable and rational consequences of the particular location of the line and how well it effectuates the objectives to be subserved or balances the opposing policies. And at once we are faced with the question, How much is "primarily"? *"Primarily commercial"* presumably signifies a test quantitative in amount; a limited dross of commercialism does not vitiate, though a more substantial amount may, and presumably will. In contrast, however, when we turn to the other assumed definition, we must presumably weigh motives or intent to determine the noncommercial nature of an enterprise "primarily for considerations other than pecuniary gain." In net result the police officers administering the regulation are to be arbiters—just as they undertook to be here—of the quantum of advertising as against protest and of the *purpose* of the citizen in speaking and writing. The test seems to be therefore both objective and subjective, though, as

---

4 Cf. 8 Geo.Wash.L.Rev. 866, 868; 28 Geo.L.J. 649; 53 Harv.L.Rev. 487; 8 I.J.A.Bull. 566, 567; 14 St. John's L. Rev. 401. Other law review comments are noted in note 5, below.

defendant concedes, the Supreme Court decisions above cited "have shifted the initial constitutional inquiry from abstract 'aim' to concrete operation." If the police are to weigh purpose and intent, as well as the effect of the literary product, "concrete operation" here will pretty surely result in prohibiting freedom of expression in ways and to an extent quite unconnected with problems of city sanitation.[5]

Plaintiff's handbill furnishes a good example of the uncertainty, not to speak of unreality, of the suggested distinctions. Sheer number of words favors the protest as against all the rest of the handbill, whether it be considered advertising or mere factual information concerning the submarine. Spacing and display give at least equal place to the protest. But if intent and purpose must be measured, how can we say that plaintiff's motives are only or primarily financial?[6] Is he just engaged in an advertising plot, or does he really believe in his wrongs? We know how opposition to oppression, real or fancied, grows upon a person, and we can suspect that by now plaintiff regards himself as a crusader against injustice. If so, he is in the democratic tradition and within the protection of the Bill of Rights, which safeguards the right of the individual even more than that of the group or party. Indeed, we think it is a misconception of the great freedom here involved to hold it more applicable to group protest for abstract religious or political principle than to individual protests for concrete business injuries. Not such was the attitude of the founding fathers; was it not against a tax on tea that one of our most cherished blows for freedom was struck? Of course, we recognize the need, as well as the common sense, of distinguishing between profit-making and nonprofit-making activities for many relevant matters, as in use of the mails, levy of customs duties, and other similar examples which defendant cites to us. But we think it is quite a different thing to say that expression in public places by handbill or circular must be, not regulated, but forbidden to the business man who would make a protest against official mistreatment of himself in his business affairs. Not such, as we understand it, is the interpretation of the constitutional intent set forth in Schneider v. State, supra. And we do not feel justified in impugning plaintiff's motives to sustain legislation with such evils inherent in it. Compare Thornhill v. Alabama, supra, 310 U.S. at page 97, 60 S.Ct. 736, 84 L.Ed. 1093.

■ To avoid misunderstanding, perhaps we should say that, while absolute prohibition of commercial handbills seems to us of doubtful validity, yet we need decide no more here than that at least it cannot extend to a combined protest and advertisement not shown to be a mere subterfuge. And without attempting to suggest the form which regulation might take, though Schneider v. State, supra, appears to point the way, we think it proper to say that even an absolute prohibition against casting matter into the streets is seemingly valid (cf. City of Philadelphia v. Brabender, 201 Pa. 574, 51 A. 374, 58 L.R.A. 220; Buxbom

---

5 Criticism of the suggested "commercial" distinction is made in 5 U. of Chi. L.Rev. 675, 676; but in 35 Ill.L.Rev. 90, 94, the subjective nature of the test— "ascertaining the principal purpose intended by the distributor in each case"— is thought capable of accomplishment "without great difficulty." For comments discussing somewhat the suggested distinction, see, also, 24 Minn.L.Rev. 570; 13 So. Calif. L.Rev. 253; 25 Wash. U. L.Q. 611; Lindsay, Council and Court; the Handbill Ordinances, 1889–1939, 39 Mich.L.Rev. 561, 580, 589, 593. It seems not referred to in many notes, 40 Col.L. Rev. 531; 1 Bill of Rights Rev. 53; cf. 15 Ind.L.J. 312; 6 Mo.L.Rev. 103, while still others point out that the Schneider case appears to invalidate absolute prohibition of even commercial circulars; see reviews cited, note 4, above.

6 Some point is made of the stipulated fact that the handbill "bears on the face thereof commercial or business advertising matter informing the public of the location of plaintiff's exhibit and soliciting their patronage," as perhaps putting plaintiff out of court on his own admission. This, however, does not purport to be a reflection of plaintiff's mind, but only an interpretation of the document, which, being before us, we can read for ourselves. It illustrates the difficulties of characterization which refinements of definition compel. For the handbill informs the public of the location of the exhibit, but nowhere directly solicits patronage; that is the reader's deduction as to the writer's intent. Should prohibition of expression rest upon the drawing of such inferences? Note, further, that the protest itself, which the police officers were willing to accept, tells of the location of the exhibit and indicates an expectation of "visitors."

v. City of Riverside, D.C.S.D.Cal., 29 F. Supp. 3), and that regulation or licensing of solicitation for business enterprises to prevent imposition upon or inconvenience of the public is likewise sustainable under the cited precedents.

Affirmed.

FRANK, Circuit Judge (dissenting).

To my mind, the majority opinion has reached the wrong conclusion primarily because it erroneously deals with this case as if it involved the attempted distribution of a single handbill of noncommercial or "free speech" character, which contains some related and incidental commercial or business advertising. On that fallacious assumption of fact, the majority holds that the city ordinance, here before us, is unconstitutional in so far as it prohibits the distribution on city streets of such a non-commercial handbill. The opinion also expresses a doubt as to its constitutionality even as to wholly commercial or business advertising circulars, but does not rest the decision on that ground. I shall later discuss that doubt; but first I shall try to show the error of the majority's factual premise, since, if that fails, the principal ground of its decision vanishes:

Chrestensen had two separate and totally distinct disputes with city officials, the one having to do with the location of his submarine, and the other with the distribution of his handbills: (a) The first dispute arose when he asked permission to do his business—that of publicly showing his submarine for profit—at a city-owned dock. When this request was refused by the Dock Commissioner, Chrestensen became indignant. [This indignation soon became, as we shall see, the subject of one of his handbills.] He was, however, able to arrange to display the submarine at a state-owned dock. (b) The second distinct dispute arose when he asked the police for permission to distribute on the city streets a handbill, Exhibit 1, which Chrestensen and the majority opinion concede to have been a frankly commercial handbill soliciting visitors to see his submarine on a paid admission basis. Because of the city ordinance here before us, the Police Commissioner, through his subordinates, denied this request.

Then Chrestensen prepared two handbills which are the subject of this litigation. They are not related, but he caused the two to be printed on the front and back, respectively, of a single sheet of paper, Exhibit A:

(a) On the face of this sheet is printed a revised edition of Exhibit 1, his earlier commercial handbill; this revised handbill is described in the stipulation of facts (executed on Chrestensen's behalf and on the basis of which this case is being decided) as consisting of "commercial and advertising matter informing the public of the location of" the submarine "and soliciting their patronage". It contains no expression of opinion on any subject, no protest against official action or against interference with Chrestensen's business.

(b) On the reverse side of the same paper, Exhibit A, is printed another handbill. It does not, in any way, refer to the dispute with the police about the distribution of handbills, but consists of a protest against the refusal to let Chrestensen display his submarine at the city's dock.

There was thus no inherent relation between the handbill printed on the face and this protest printed on the back of Exhibit A. The latter was, without question, an expression of opinion, the distribution of which, on the city streets, could not constitutionally be prevented. This no one denies: The city ordinance excepts such a handbill from its prohibition, and the police expressly told Chrestensen that he could separately distribute this "free speech" handbill, without police restraint, if only it was separated from the other handbill.

There was no reason why he could not do so; he elected, instead, to have both handbills printed on one piece of paper. The two circulars are not Siamese twins. As they are unrelated in subject matter, they could easily have been divided without injury to either. Nothing in the majority opinion even intimates the contrary, even suggests that there is anything but a printer's or paper connection between the two.

Since this purely paper tie is solely the result of the arbitrary choice of their common author, Chrestensen, he has no standing to assert that we must consider that what the printer has joined no man can put asunder, that we must, artificially, regard the two handbills as inseparable when we are asked to exercise the delicate judicial power of nullifying legislation. It is as if the suit related to a handbill advertising an automobile for sale which also included an attack on Nazism or a protest against the tax on cigarettes. Consequent-

ly, if we proceed on the principal assumption of the majority opinion, i. e., that the ordinance is invalid in so far as it prevents the distribution of anything other than an outright and unmixed commercial handbill, we should completely ignore the separable and independent "free speech" circular on the back of Exhibit A, and consider the case precisely as if Chrestensen had been denied permission to distribute merely a handbill containing nothing except what is printed on the face of that paper. Thus considered, the issue narrows to this: Is that separable handbill, on the face of Exhibit A, wholly commercial?

That it is wholly commercial is, to my mind, manifest: At the outset, it is essential to note that Chrestensen's purpose or motive in proposing to distribute his original handbill, Exhibit 1—which he withdrew and for which he substituted the matter on the face of Exhibit A—is admitted to have been frankly and completely commercial. There is a presumption that, at least for a short interval, a man's purpose or motive continues the same. And so as to Chrestensen.[7] That in the distinct and separable "free speech" handbill, printed on the reverse of Exhibit A, Chrestensen had a quite different motive or purpose, surely does not overcome that presumption.

And there is no other evidence to overcome it. Contrariwise, the record reenforces the presumption. Here we must turn to the stipulation of facts on which, as the majority opinion points out, the District Court exclusively relied when entering its final decree. There was no trial at which the testimony of witnesses was heard. We must assume, therefore, that, if there had been such a trial, the city would have offered testimony conclusively proving—and that the trial court on that basis would have found—the following facts set forth explicitly in that stipulation of facts:

"5. Defendant, or his agents, by threatening to enforce the health regulation against plaintiff, has restrained plaintiff from distributing in the streets and other public places of the City of New York, copies of a certain handbill * * * a copy of which is attached to the Bill of Complaint and marked 'Plaintiff's Exhibit A' * * *

"6. Handbill A bears *on the face* thereof *commercial* or *business advertising matter* informing the public of the location of plaintiff's exhibit and *soliciting their patronage.*

"7. The *reverse side* of handbill A *contains, not commercial or business advertising matter, but rather a public protest* against the conduct of the New York City Department of Docks in denying plaintiff wharfage facilities at piers owned by New York City and situated at the Battery.

"8. Plaintiff had earlier, on or about June 29, 1940, prepared a handbill, hereinafter called handbill No. 1, a copy of which is attached hereto and marked 'Defendant's Exhibit 1' and by this reference made a part hereof.

"The defendant, or his agents, informed the plaintiff that the distribution of handbill No. 1 would be a violation of the park and health regulations but that plaintiff could distribute handbills which contained only information or a public protest.

"Plaintiff thereupon revised handbill No. 1 by removing from the face of it certain advertising matter and by printing on the reverse side of the handbill a public protest, which revised handbill is handbill A.

"On being shown a printer's proof of handbill A, *defendant,* or his agents, *advised plaintiff that the protest matter on the reverse side thereof could be distributed without police restraint, if separated from the commercial advertising matter remaining on the face thereof.*

"Plaintiff caused handbill A to be printed with the said protest matter appearing on the reverse side thereof, and *has not attempted to distribute said protest matter disassociated from said commercial advertising matter.* Defendant, or his agents, restrained the plaintiff from distributing handbill A, as described in paragraphs 5 and 9 hereof, and plaintiff thereupon brought this action.

"9. Defendant by threatening to enforce the park regulation against plaintiff has restrained plaintiff from displaying 'sandwichman' placards and from distributing copies of handbill A upon streets and sidewalks adjacent and contiguous to the central area of Battery Park, but within the jurisdiction of the Commissioner of Parks and possibly within the borders of the vari-

---

[7] "Motive is a persuasive interpreter" even of "equivocal conduct". Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 559, 50 S.Ct. 427, 430, 74 L.Ed. 1034.

ous tracts of land dedicated for park purposes in the Battery Park area.

"10. *The restraints* described in paragraphs 5 and 9 hereof *have resulted, and* their continuance *will result, in a diminution* of the number of *persons paying fees for admission* to plaintiff's submarine. The *net profits* which plaintiff would realize in the absence of said restraints *exceed the sum of three thousand dollars* ($3,000)."[8]

Those stipulated and uncontroverted facts—taking the place, I repeat, of inferences which we must assume would irresistibly have been drawn from evidence which the city presumably would have offered in the absence of a stipulation—leave no room for doubt, in my mind, that Exhibit A consists (1) of a purely commercial handbill set forth on its face[9] and (2) a separable free-speech handbill on the back.

If Chrestensen had taken the witness stand and testified, without equivocation, that his intention with respect to matter on the face of the paper was wholly commercial as contrasted with his intention as to the matter on the reverse side, which was noncommercial, we would stultify ourselves if we disregarded such evidence. I can perceive no difference between such testimony and the statement in the stipulation of facts, executed on Chrestensen's behalf, that Exhibit A bears on its face "commercial or business advertising matter", while, on the other hand, "the reverse side * * contains, not commercial or business advertising matter, but rather a public protest * * *". Why should we disregard Chrestensen's own interpretation of his two distinct purposes?

Moreover, in ascertaining his purpose, we may take judicial notice of the motives which commonly operate upon human conduct; it has been said that human nature constitutes part of the evidence in every case, and that judges are supposed to be acquainted with the ordinary sentiments of the people among whom they live.[10] "We take judicial cognizance of all matters of general knowledge", said the Supreme Court.[11] And if a court may judicially notice that many men postpone being shaved until Sunday,[12] of the characteristics of the game of ping pong,[13] and of horse races,[14] of how shoe-shining parlors are run,[15] of the reliance of waiters on tips from patrons,[16] of the end of the yachting season,[17] and of the kicking propensities of mules,[18] we should not confess that we are so cloistered that we do not know that the dominant purpose of most men, *when engaged in business,* is to seek customers and make profits. There is no cynicism in that observation: While the average American is by no means an economic man, yet his economic strivings, at those moments when he is functioning as a business man, are entirely legitimate; and it would be unwise for judges to be so naive as to ignore them. Accordingly, Chrestensen being a business man, we are more than justified in concluding that, as his sole purpose in connection with his original handbill was unquestionably commercial, his purpose in trying to distribute the handbill found on the face of Exhibit A was the same. We know that his business is that of showing his submarine for profit; we know that, if members of the public appeared, in response to the invitation in that handbill, they would be charged admission; we know that that is why Chrestensen wanted them to appear; we know that he does not display his submarine for educational or propaganda purposes. Why, then, should we refuse to recognize that the handbill on the face of Exhibit A was commercial?

---

[8] Italics are added.

[9] The District Judge, indeed, reached that conclusion as to Exhibit A in its entirety, in his opinion (rendered when he entered his preliminary injunction) in which he said, "The ordinance is clearly discriminatory against the business man while affording protection to persons, distributing non-commercial handbills * * *." 34 F.Supp. 596, 600.

[10] 23 C.J. 149, notes 9, 10, 11.

[11] Muller v. Oregon, 208 U.S. 412, 421, 28 S.Ct. 324, 326, 52 L.Ed. 551, 13 Ann. Cas. 957.

[12] State v. Petit, 74 Minn. 376, 77 N. W. 225, affirmed 177 U.S. 164, 20 S.Ct. 666, 44 L.Ed. 716.

[13] United States v. Strauss, 2 Cir., 136 F. 185.

[14] Webber v. Chicago, 50 Ill.App. 110, affirmed 148 Ill. 313, 36 N.E. 70.

[15] Barlin v. Knox County, 136 Tenn. 238, 188 S.W. 795, 2 A.L.R. 112.

[16] Sloat v. Rochester Taxicab Co., 177 App.Div. 57, 163 N.Y.S. 904, affirmed Sloate v. Rochester Taxicab Co., 221 N. Y. 491, 116 N.E. 1076.

[17] The Conquerer, 166 U.S. 110, 17 S. Ct. 510, 41 L.Ed. 937.

[18] Consolidation Coal Co. v. Pratt, 169 Ky. 494, 184 S.W. 369, L.R.A.1916D, 1229.

To be sure, there have been cases, cited in the majority opinion,[19] where one handbill contains two purposes which so inextricably penetrate one another so as to make fission impossible or impracticable; in that event, if the dominant purpose is noncommercial, the ordinance, in order to preserve its constitutionality, would be so interpreted as not to bring the handbill within its scope.[20] But that is not this case, for there is no evidence here of mixed motives as to the handbill on the face of Exhibit A.[21] There is, therefore, no reason for our discussing problems not now before us relating to mixed purpose handbills; the Supreme Court, since the beginnings of our government, has wisely refused to cross such imaginary bridges.[22]

We should not be disturbed because, in the future, cases may arise where there will be some difficulty in ascertaining the primary purpose in distributing a handbill, and, because, when such cases arise, the courts may not be able to stop at locating merely the north and south poles of the subject matter, but may be required to do a more precise job of legal map-making and to fix a definite equatorial line. Where to draw such lines "is the question in pretty much everything worth arguing in the law", Mr. Justice Holmes often noted.[23] As he said, some forty years ago,[24] "In our approach towards exactness we constantly tend to work out definite lines or equators to mark distinctions which we first notice as a difference of poles. It is evident in the beginning that there must be differences in the legal position of infants and adults. In the end we establish twenty-one as the dividing point. There is a difference manifest at the outset between night and day. The statutes of Massachusetts fix the dividing points at one hour after sunset and one hour before sunrise, ascertained according to mean time. When he has discovered that a difference is a difference of degree, that distinguished extremes have between them a penumbra in which one gradually shades into the other, a tyro thinks to puzzle you by asking where you are going to draw the line, and an advocate of more experience will show the arbitariness of the line proposed by putting cases very near to it on one side or the other. But the theory of the law is that such lines exist, because the theory of the law as to any possible conduct is that it is either lawful or unlawful. As that difference has no gradation about it, when applied to shades of conduct that are very near each other, it has an arbitrary look. We like to disguise the arbitrariness, we like to save ourselves the trouble of nice and doubtful discriminations". Nevertheless, on occasions, the courts must and do take that trouble. They have done so recently, with great frequency in the field of taxation. Cf. Harrison v. Schaffner, 1941, 61 S.Ct. 759, 85 L.Ed. 1055.

Difficulties, far greater than those here

---

19 Schneider v. State of New Jersey (Young v. People of State of California), 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; People v. Taylor, 33 Cal.App.2d, Supp., 760, 85 P.2d 978.

20 See People v. Loring and Green, unreported, but noted in 1 I.J.A.Bull. No. 12, p. 2, holding the New York ordinance inapplicable to a leaflet announcing a meeting and specifying the price of admission.

21 The other "free speech" handbill, on the reverse side of the paper, does advise the public to visit the submarine. It might be argued that this showed a partial commercial purpose. But the city conceded that that separable handbill was freely distributable, if separated.

22 Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246; Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; concurring opinion in Coleman v. Miller, 307 U.S. 433, 460, 59 S.Ct. 972, 83 L.Ed. 1385, 122 A.L.R. 695.

23 Irwin v. Gavit, 268 U.S. 161, 168, 45 S.Ct. 475, 476, 69 L.Ed. 897; cf. Superior Oil Co. v. Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504; Empire Trust Co. v. Cahan, 274 U.S. 473, 478, 47 S.Ct. 661, 71 L.Ed. 1158, 57 A.L.R. 921; Haddock v. Haddock, 201 U.S. 562, 631, 632, 26 S.Ct. 525, 50 L.Ed. 867, 5 Ann. Cas. 1; Schlesinger v. Wisconsin, 270 U.S. 230, 241, 46 S.Ct. 260, 70 L.Ed. 557, 43 A.L.R. 1224; Louisville Gas & Electric Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770; Quaker City Cab Co. v. Pennsylvania, 277 U.S. 389, 403, 48 S.Ct. 553, 72 L.Ed. 927; Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 57 L.Ed. 1232; Bullen v. Wisconsin, 240 U.S. 625, 630, 631, 36 S.Ct. 473, 60 L.Ed. 830. See Cardozo, The Nature of the Judicial Process (1921) 46; The Paradoxes of Legal Science (1928) 62.

24 Law in Science—Science in Law, Collected Legal Papers (1920) 210, 232–233 (reprinted from 12 Harv.L.Rev. [1899] 443); Cf. Holmes, The Common Law (1881) 127, 110, 68.

confronting us, involved in ascertaining a dominant intent, purpose or motive, or in disentangling mixed intentions, purposes or motives, have not heretofore deterred the courts from doing so; they have not found it impossible to answer such questions as that which perplexes my colleagues, i. e., "How much is 'primarily'?" They have not failed to make what the majority somewhat invidiously calls "refined distinctions". Thus, to cite but one example, although a statute is itself constitutional, its enforcement will be enjoined where a court, on the basis of elaborate evidence extrinsic to the statute, finds operative in its actual administration a discriminatory purpose or motive of an unconstitutional kind.[25] In such cases, the purpose or motive is not, as the majority opinion suggests, determined by any subtle or occult "subjective" test.

And especially in the instant case there need be no judicial anguish in drawing a line, and no occasion for psychological probings of Chrestensen's mental interior in order to ascertain what he was after when endeavoring to distribute the matter on the face of Exhibit A: His original purpose, the contents of his stipulation of facts, his complaint that the enforcement of the city's ordinance diminished the number of persons paying fees for admission so as to cause him a loss of profits in excess of $3,000,[26] are ample objective indicia of a commercial purpose with reference to the separable handbill printed on the front of Exhibit A. A shrinking from the use of such evidence is of a piece with the hostility to the employment of so-called "circumstantial evidence" which our court recently condemned in F. W. Woolworth v. N. L. R. B., 2 Cir., 1941, 121 F.2d 658; we there said that "courts, * * * in a multitude of cases, must rely upon such evidence, i. e., inferences from testimony as to attitudes, acts and deeds; where such matters as purpose, plan, designs, motives, intent, or similar matters, are involved, the use of such inferences is often indispensable. Persons engaged in unlawful conduct seldom write letters or make public pronouncements explicitly stating their attitudes or objectives; such facts must usually be discovered by inference; the evidence does not come in packages labelled, 'Use me', like the cake, bearing the words 'Eat me', which Alice found helpful in Wonderland".

Suppose that a department store, whose owners were recognized as not being in business for their health, were to attempt to distribute, on the streets, a handbill saying nothing but this: "We have on display at our store many copies of beautiful early American furniture". If the store owners sought an injunction to restrain the city from preventing the distribution on the streets of such an advertisement, a court surely would not grant the injunction because the handbill itself contained nothing which disclosed a commercial intention. It would not say that, as the advertisement was silent as to sales, it must be assumed that there was little or no profit motive behind it, but merely a desire to educate. The judicial vision is not so feeble that it cannot look beyond the contents of such a paper. And yet that is the attitude of the majority in Chrestensen's case.

It is a strange and novel doctrine that his intention must be discovered without any reference to data not found in the document itself, that even his own explicit statement of his intention, contained in the stipulation, cannot be looked at. Except where the parole evidence rule or the statute of frauds is applicable, judges have not heretofore disclosed such timidity, have not denied themselves the use of those usual objective means of ascertaining intention which are open to ordinary men.

The majority opinion, however, suggests that if the courts were to sanction the use of such evidence extrinsic to the document, the result would be that the city's police officers would become the "arbiters" of the citizen's intention, with a consequent arbi-

---

[25] Yick Wo v. Hopkins, 118 U.S. 356, 373, 374, 6 S.Ct. 1064, 30 L.Ed. 220; Cumberland Coal Co. v. Board of Revision, 284 U.S. 23, 28, 52 S.Ct. 48, 76 L. Ed. 146; Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074. For other illustrations, cf. Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. (1894), Collected Legal Papers (1920) 117; Paul, Selected Studies in Taxation, Second Series (1938) 255 ff.

[26] Even if it were true that federal jurisdiction required such an allegation, that would not serve to diminish the significance of that complaint as to loss of profits. For the constitutional objection could as well have been raised in the state court. Moreover, it is highly doubtful whether such an allegation was necessary in this case to ensure federal jurisdiction. See Hague v. C. I. O., 307 U.S. 496, 508, 59 S.Ct. 954, 83 L.Ed. 1423.

trary power, not reviewable by the courts, to interfere with the distribution of free speech handbills. Of course, that cannot be true. Whatever may be the means employed by city officials to determine whether a handbill is commercial, the courts are open to the citizen who believes that the city's official's decision is incorrect. I cannot, however, believe it necessary or proper for the courts to attempt to prevent any possible abuse of official power by holding that legislation is unconstitutional which confers upon officials the legitimate exercise of such power. Nothing in the Constitution justifies such conduct by the judiciary; a constitution which gave judges that kind of authority, and which they exercised, would cause that paralysis of government and that condition of anarchy, leading ultimately to despotism, which our Constitution, so The Federalist tells us, was designed to prevent.[27]

2. The majority, in its opinion, however, strongly intimates that if it had concluded that this case related solely to a wholly commercial circular, it would nevertheless have held the ordinance unconstitutional. In other words, the majority finds it difficult to see why (a) if, as is without doubt true, a business man may not constitutionally be prevented from circularizing, in public places, a protest against official action affecting his business, he must not also (b) be similarly protected in distributing business circulars wholly designed to procure public patronage for profit. Both, the majority suggests, are protected by the constitutional principle of free speech which paralyzes or numbs the city's so-called "police power". I cannot agree.

Constitutional like other legal principles do not dwell a la Robinson Crusoe, or in an anarchic state of nature where there is a war of all against all; they must learn to live with one another, sociably, in a sort of democracy of ideas in which none is dictator. Thus, for example, due process, although it must yield somewhat when it encounters the war power, or the power to exclude aliens, or the bankruptcy power, is still not impotent.[28]

There need, therefore, be no ruthless dogma fight to a finish between the city's so-called "police power" (exercisable for the group welfare) and the constitutional right of the individual to free speech and free expression of ideas. It has been recognized, since at least the time of Aristotle, that it is dangerous to give any one principle its head, to regard it as an absolute, to let it work its way out, uncurbed, to its extreme logical limit.[29] We must, rather, regard principles as each expressing a general tendency to be reconciled with other such principles. "To bring about reconciliations" of legal principles is "the great role of jurists"; their task, in the face of contradictory principles, is that of "cutting out a little here and a little there * * *. As Montesquieu observed, 'despots alone try to govern everything with a general scheme and a rigid will' * * *. The contradictory elements frequently found in problems * * * throw us into a regime of concession or compromise * * *. Thus we reach that middle ground which is all that we can hope for in this world".[30]

Nor should that distress us. For compromise is the very essence of living. Walking is a compromise between falling down and standing up; sleep is a compromise between full vitality and death. All compromises are not evil or foolish. There is an obvious distinction between intelligent, courageous compromise—or adjustment—and cowardly appeasement. Our Constitution, as every school boy knows, is a set of compromises. Government in a democracy is constantly engaged in a series of experiments in achieving compromises;[31]

27 Cf. The Federalist (Earle's edition, 1937) No. 70 (p. 454); cf. No. 68 (p. 444) and No. 51 (p. 337).

28 See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589, note 19, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106.

29 Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828, 14 Ann.Cas. 560.

30 Demogue, Analysis of Fundamental Nations (Modern French Legal Philosophy, in the Modern Legal Philosophy Series, 1921) 570, 413, 394.

"All ideas of truth are false, that is,

contradictory and irrational, if one attaches to them an exclusive and absolute meaning; they are all verities, that is susceptible of realization and utility, if they are viewed in relation to others, or in evolution". Proudhon, Philosophie Du Progres (1868) 22, quoted by Borchard, Governmental Responsibility in Tort, 36 Yale L.J. (1927) 1039, 1041, note 2.

31 Cf. Mr. Justice Douglas, Democracy and Finance (1940) 240 ff. 260 ff.

In Chappell v. Ellis, 1898, 123 N.C. 259, 31 S.E. 709, 711, 68 Am.St.Rep. 822, the court said that "we feel compelled to carry out a principle only to its

its aim is, or should be, almost always to find a middle ground; if such a government tends, in some respects, to be less flexible in war-time, that, too, is but a *temporary* compromise with the basic tenets of a democracy in order to preserve them.[32]

Absolutists sneer at compromises; "they are the Gordian knot-cutters; they may undo the knot, but they ruin the rope"; life, they think, "can be folded neatly down the middle, with all the good on one side, all the bad on the other, and everything is accounted for * * * "[33] As Morley said, "The disciples of the relative may afford to compromise. The disciples of the absolute, never".[34] Even Hobbes, generally (although perhaps erroneously) regarded as an extreme absolutist, said that "in a way beset with those that contend, on one side for too great liberty, and on the other side, for too much Authority, 'tis hard to pass between the points of both unwounded * * * For as long as every man holdeth this Right of doing anything he liketh, so long are men in the condition of War."[35]

The right of free speech and free expression, because of our history, is one of our fundamental liberties, singularly well protected;[36] it, therefore, comes as near to creating an absolute principle as any fostered by our Constitution.[37] And, particularly today, freedom of expression is a value which Americans should dearly cherish. For it is our challenge to dictatorship and its vaunted efficiency. Desirable social adjustments, as well as increased efficiency in industry, derive from new ideas; and new ideas will be stifled, even in the minds of their originators, if not given expression; the uncommunicated thought is usually still-born. We may rejoice that there is embodied in our Constitution a belief that (to quote our wise and eloquent Senior Circuit Judge) "where heterodoxy in what men prize most is a crime, fresh thinking about anything will disappear", a "faith that our collective fate in the end depends upon the irrepressible fertility of the individual * * * "[38]

But even the principle of free speech is not an absolute; it has its limitations.[39] Thus one may commit a crime, or be guilty

---

necessary and logical results, and not to its furthest theoretical limit, in disregard of other essential principles. The one universal law of nature is that all action, animate as well as inanimate, is the result of conflicting forces. The orbit of the earth depends upon the exquisite adjustment of two conflicting forces,—the centripetal power of attraction, and the centrifugal force of momentum. The preponderance of either would lead to inevitable destruction. The trajectory of every shot is governed by three opposing forces,—momentum, friction, and gravitation; the speed with which it leaves the gun, the resistance of the atmosphere, and the attraction of the earth. It is so with human action. Government itself is recognized as springing from the love of personal liberty, on the one hand, and the desire for personal protection, on the other. It is said that their just equilibrium produces a government of liberty without license, and of law without tyranny, but that its disturbance would lead to anarchy or to despotism. We do not feel at liberty to adopt any one principle as the sole guide of our decisions, and to carry it out to extreme and dangerous limits, regardless of other great principles of justice and of law, so firmly established by reason and precedent."

[32] Article 1, section 9 of the Constitution expressly provides that the privilege of habeas corpus may be suspended when in cases of rebellion or invasion the public safety may require it; and see Amendment 5 as to presentment or indictment by a grand jury. Cf. Mr. Justice Reed's suggestion, in Milk Wagon Drivers Union v. Meadowmoor Co., 312 U.S. 287, 320, 61 S.Ct. 552, 567, 85 L.Ed. 836, 132 A.L.R. 1200: "Free speech may be absolutely prohibited only under the most pressing national emergencies. These emergencies must be of the kind that justify the suspension of the writ of habeas corpus or the suppression of the right of trial by jury".

[33] Hayakawa, Language in Action (1941) 133, 126.

[34] Compromise, 44.

[35] Leviathan (1651), dedicatory letter and p. 65.

[36] Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155.

[37] Chief Justice Stone suggests that the usual presumption of constitutionality is restricted in scope when legislation appears on its face to offend the specific provisions in the first ten amendments "which are deemed equally specific when held to be embraced within the Fourteenth". United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234, n. Cf. Hamilton and Braden, The Special Competence of the Supreme Court, 50 Yale L.J. 1319, 1352ff.

[38] Learned Hand, Liberty, 4 Yale Alumni Magazine (1941) 10, 12.

[39] Cf. Schneider v. State, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155; cf.

of an actionable wrong, if he wantonly shouts "fire" in a crowded theater; or utters certain kinds of untruths—or, in some circumstances, even truths.[40] And, while the city's "police power" to prevent the cluttering of the streets with "free speech" handbills must give ground before the privilege of free speech, that power, although then chastened, is not utterly destroyed; the Supreme Court merely says that, in that event, the power must be used punitively and after the fact—by fining or jailing those who abuse the privilege—and not preventively. Schneider v. State, 308 U.S. 147, 148, 60 S.Ct. 146, 84 L.Ed. 155.

However, the historical events which yielded the constitutional protection of free speech and free expression do not by any means compel or even suggest the conclusion that there is an equally important constitutional right to distribute commercial handbills—for the purpose of profit-making—so imperative that the city's "police power" must similarly be reduced (from prevention to punishment after the fact) when pieces of paper, devised for business purposes, may litter its streets to the injury of public health or safety. Were the concept of free expression so extensive in scope, the outdoor advertising and billboard cases[41] would be inexplicable; surely the recent "free speech" decisions of the Supreme Court are not to be read as overruling those precedents. In Schneider v. State, 1939, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155, when upholding the right to distribute leaflets, as in Lovell v. Griffin, 1937, 303 U.S. 444, 452, '58 S.Ct. 666, 669, 82 L.Ed. 949, the Court was referring to "historic weapons in the *defense of liberty*" such as "the pamphlets of Thomas Paine". And the Court has recently described those cases, and Hague v. C. I. O., 1939, 307 U.S. 396, 59 S.Ct. 954, 83 L.Ed. 1423, as "concerned with restrictions cutting off appropriate means through which, in a free society, the *processes of popular rule* may effectively function". Minersville School District v. Gobitis, 1940, 310 U.S. 586, 599, 60 S.Ct. 1010, 1015, 84 L.Ed. 1375, 127 A.L.R. 1493, note 6.[42]

Such men as Thomas Paine, John Milton and Thomas Jefferson were not fighting for the right to peddle commercial advertising. To note that fact is not at all to decry the profit-making zeal of the American business man. I, for one, would not refer, as the majority does, to a "commercial taint". For, as ours is a profit economy, no business man need apologize for seeking personal gain by all legitimate means. But the constitutional limitations on legislation affecting such pursuits are not as specific and exacting as those imposed on legislation interfering with free speech. To prevent the peddling of business handbills on the street still leaves the businessman at libery to use other modes of advertising, as in newspapers, for instance.[43]

I most heartily agree with the statements in the majority opinion that the right of free speech is no "more applicable to group protest for abstract religious or political principle than to individual protests for concrete business injuries" and that the "expression in public places by handbill or circular" cannot be "forbidden to the business man who would make a protest against official mistreatment of himself in his business affairs". But it is one thing thus to say that a protest by a businessman against what he considers mistreatment of himself in business affairs must be regarded as constitutionally protected free speech and quite another to say the same of the businessman's circulars advertising for business. For the right of free speech guaranteed by the Constitution is the right to disseminate opinion; the protection accorded to this right, which renders invalid any effort to prohibit the

Gorin v. United States, 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488.

40 American Bank & Trust Company v. Federal Reserve Bank, 256 U.S. 350, 358, 41 S.Ct. 499, 65 L.Ed. 983, 25 A.L.R. 971; Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. (1894) 1, Collected Legal Papers (1920) 117.

41 Fifth Avenue Coach Co. v. New York City, 1911, 221 U.S. 467, 31 S.Ct. 709, 55 L.Ed. 815; Packer Corp. v. Utah, 1932, 285 U.S. 105, 52 S.Ct. 273, 76 L.Ed. 643, 79 A.L.R. 546. See, also, Mutual Film Corp. v. Industrial Commission, 1915, 236 U.S. 230, 243, 244, 35 S.Ct.

387, 59 L.Ed. 552, Ann.Cas.1916C, 296; Lewis Publishing Co. v. Morgan, 1912, 229 U.S. 288, 313–316, 33 S.Ct. 867, 57 L.Ed. 1190; cf. Stromberg v. California, 1931, 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484, with Halter v. Nebraska, 1907, 205 U.S. 34, 27 S.Ct. 419, 51 L.Ed. 696, 10 Ann.Cas. 525.

42 Italics in the quotation are added.

43 A discrimination which favors newspaper advertising is not unconstitutional. Packer Corp. v. Utah, 1932, 285 U.S. 105, 52 S.Ct. 273, 76 L.Ed. 643, 79 A.L.R. 546.

distribution of free speech documents, should not be extended to commercial advertisements simply because the word "speech", taken alone, includes both social and business discourse.[44]

I can find neither reason nor authority for such an extension. So to amplify the constitutional guaranty would be to "thingify" the words "free speech" and "free expression", and to become forgetful of the vital ideas—"the defense of liberty" and the functioning of "the processes of popular rule"—for which they stand.[45] The danger of converting words into thought-paralyzing entities is illustrated by the judicial history of the phrase "liberty of contract". Compare Lochner v. New York, 1905, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133, with West Coast Hotel Co. v. Parrish, 1937, 300 U.S. 379, 391–394, '57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330.[46] The Supreme Court recently reminded us that such "tags are not instruments of adjudication but statements of result in applying the sole constitutional test. * * * Ambiguous intimations of general phrases in opinions torn from the significance of concrete circumstances * * * do not alter the limited nature of the function" of the courts. "We must be on guard against imprisoning" the powers of the states and their subdivisions "within formulas that are not compelled by the Constitution but merely represent judicial generalizations exceeding the concrete circumstances which they profess to summarize". Wisconsin v. J. C. Penney Co., 311 U.S. 435, 444, 445, 61 S.Ct. 246, 250, 85 L.Ed. 267, 130 A.L.R. 1229. Particularly when we are asked to exercise the high judicial prerogative of holding legislation unconstitutional, we should resist that seductive power of words, of which Ingraham has given the classic illustration: "We do not often", he writes,[47] "have occasion to speak, as an indivisible whole, of the group of phenomena involved in or connected with the transit of a Negro over a rail fence with a watermelon under his arm when the moon is just passing under a cloud. But if this collocation of phenomena were of frequent occurrence, and if we did have occasion to speak of it often, and if its happening were likely to affect the money market, we should have some name such as 'Wousin' to denote it by. People would in time be disputing whether the existence of a Wousin involved necessarily a rail fence, and whether the term could be applied when a white man is similarly related to a stone wall". The principle of free speech should not be demeaned by turning it into a Wousin.

It may be that the majority was affected by an argument, advanced by Chrestensen, that, because the ordinance permits the free circularization of noncommercial handbills, which have no less a capacity to litter the streets, it is in violation of the "equal protection" clause of the Constitution. But that clause does not prohibit a reasonable classification; and it is well established that, if there is a rational basis for a classification, the legislature may select for correction a particular one out of several similar evils. Sproles v. Binford, 286 U.S. 374, 396, 52 S.Ct. 581, 76 L.Ed. 1167. Apart from that, here the classification is one established by the Constitution itself. Once it is admitted that noncommercial handbills are constitutionally outside the scope of the so-called police power, it follows that legislation which operates only on that part of the field which is left, i. e., commercial handbills, is employing the very classification imposed by the Constitution itself. Accordingly, in Packer Corporation v. Utah, 285 U.S. 105, 52 S.Ct. 273, 274, 76 L.Ed. 643, 79 A.L.R. 546, the Supreme Court upheld a statute prohibiting billboard advertising of tobacco, rejecting the contention that it was unreasonable to discriminate in favor of newspaper advertising, which was protected because newspapers circulate in interstate commerce. The Court said: "The classification alleged to be arbitrary was made in order to comply with the requirement of the Federal Constitution as interpreted and applied by the highest court of the state. Action by a state taken to observe one prohibition of the Constitution does not entail the viola-

---

44 One is reminded of the librarian who, in his catalogue, put "Mill on Liberty" and followed this notation by "Ditto on the Floss".

45 Cf. Holmes, Law in Science—Science in Law, Collected Legal Papers, supra, 238, 230–232.

46 See discussion of those cases in Hume v. Moore-McCormack Lines, Inc., 2 Cir., 1941, 121 F.2d 336.

47 Swain School Lectures 121, quoted in Ogden and Richards, The Meaning of Meaning, 2d Ed., 416.

526

tion of another [citing cases]". Cf. also J. E. Raley & Brothers v. Richardson, 264 U.S. 157, 160, 44 S.Ct. 256, 68 L.Ed. 615.

There remains a contention advanced by appellee against the ordinance which the majority opinion does not consider, but which, because I regard the ordinance valid, I must discuss: The ordinance expressly prohibits only commercial advertising and does not mention a dual purpose document of the kind before us. Aside from the fact that, in applying the statute as it did, the city was engaged in a proper administrative function, I would not interpret the statute to permit the distribution of such an artificial hybrid as this, since that would, by pointing the way to easy evasion, utterly destroy the efficacy of the prohibition. The ordinance, as originally enacted, did not expressly exempt commercial handbills, but such an exemption was read into it in 1921 by People v. Johnson, 117 Misc. 133, 191 N.Y.S. 750, to avoid a conflict with the New York Constitution. This judicial construction, of course, carved out of the statute's realm only handbills which were constitutionally protected. In 1938, an express exemption of noncommercial advertising was added, presumably in response to Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 669, 82 L.Ed. 949, which held that a blanket ordinance was "invalid on its face".[48] The legislative intention was patently merely to exclude such a control of handbills as would render the ordinance invalid under the Federal constitution. Clearly what was meant was that only handbills constitutionally protected from such regulation were to be excluded. Any handbill primarily commercial was to be covered; and certainly a separable commercial handbill was so included. That the courts should regard the obvious legislative policy, and not thwart it by narrow construction, has been vigorously stated in recent decisions. See United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345; Apex Hosiery Co. v. Leader, 310 U.S. 469, 489, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Dickerson, 310 U.S. 554, 562, 60 S.Ct. 1034, 84 L.Ed. 1356. Mr. Justice Holmes, on Circuit, in Johnson v. United States, 1 Cir., 1940, 163 F. 30, 32,

18 L.R.A.,N.S., 1194,[49] said that "it is not an adequate discharge of duty for courts to say [to the legislature] : We see what you are driving at, but you have not said it * * * *."

I conclude, therefore, that Chrestensen's paper includes a separate outright commercial handbill; that that separate handbill is within the prohibition of the ordinance; and that the constitutional guaranty of free speech does not render unconstitutional the prohibition of the distribution on the city's streets of such a purely commercial advertisement merely because it is deliberately coupled with a totally distinct and easily separable exercise of the privilege of free speech.

---

48 It is, of course, immaterial that the amendment, because of the established judicial construction of the statute, may have been adopted out of an excess of caution.

49 Cited and quoted with approval in Keifer & Keifer v. R. F. C., 1939, 306 U.S. 381, 391, 59 S.Ct. 516, 83 L.Ed. 784, note 4.