## MINERSVILLE SCHOOL· DISTRICT, BOARD OF EDUCATION OF MINERSVILLE SCHOOL DISTRICT, ET AL. v. GOBITIS ET AL.

No. 690.   Argued April 25, 1940.—Decided June 3, 1940.

*Mr. Joseph W. Henderson,* with whom *Messrs. John B. McGurl, Thomas F. Mount,* and *George M. Brodhead, Jr.* were on the brief, for petitioners.

*Messrs. Joseph F. Rutherford* and *George K. Gardner* argued the cause, and with the former *Mr. Hayden Covington* was on the brief, for respondents.

590

By leave of Court, briefs of *amici curiae* were filed on behalf of the Committee on the Bill of Rights, of the American Bar Association, consisting of *Messrs. Douglas Arant, Zechariah Chafee, Jr., Grenville Clark, Osmer C. Fitts, Lloyd K. Garrison, George I. Haight, Monte M. Lemann, Ross L. Malone, Jr., Burton W. Musser, Joseph A. Padway,* and *Charles P. Taft;* and by *Messrs. George K. Gardner, Arthur Garfield Hays, Osmond K. Fraenkel, William G. Fennell, Jerome M. Britchey,* and *Alexander H. Frey,* on behalf of the American Civil Liberties Union,— urging affirmance.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

A grave responsibility confronts this Court whenever in course of litigation it must reconcile the conflicting claims of liberty and authority. But when the liberty invoked is liberty of conscience, and the authority is authority to safeguard the nation's fellowship, judicial conscience is put to its severest test. Of such a nature is the present controversy.

Lillian Gobitis, aged twelve, and her brother William, aged ten, were expelled from the public schools of Minersville, Pennsylvania, for refusing to salute the national flag as part of a daily school exercise. The local Board of Education required both teachers and pupils to participate in this ceremony. The ceremony is a familiar one. The right hand is placed on the breast and the following pledge recited in unison: "I pledge allegiance to my flag, and to the Republic for which it stands; one nation indivisible, with liberty and justice for all." While the words are spoken, teachers and pupils extend their right hands in salute to the flag. The Gobitis family are affiliated with "Jehovah's Witnesses," for whom the Bible as the Word of God is the supreme authority. The chil-

dren had been brought up conscientiously to believe that such a gesture of respect for the flag was forbidden by command of Scripture.[1]

The Gobitis children were of an age for which Pennsylvania makes school attendance compulsory. Thus they were denied a free education, and their parents had to put them into private schools. To be relieved of the financial burden thereby entailed, their father, on behalf of the children and in his own behalf, brought this suit. He sought to enjoin the authorities from continuing to exact participation in the flag-salute ceremony as a condition of his children's attendance at the Minersville school. After trial of the issues, Judge Maris gave relief in the District Court, 24 F. Supp. 271, on the basis of a thoughtful opinion at a preliminary stage of the litigation, 21 F. Supp. 581; his decree was affirmed by the Circuit Court of Appeals, 108 F. 2d 683. Since this decision ran counter to several *per curiam* dispositions of this Court,[2] we granted *certiorari* to give the matter full reconsideration. 309 U. S. 645. By their able submissions, the Committee on the Bill of Rights of the American Bar Association and the American Civil Liberties Union, as friends of the Court, have helped us to our conclusion.

We must decide whether the requirement of participation in such a ceremony, exacted from a child who refuses

---

[1] Reliance is especially placed on the following verses from Chapter 20 of Exodus:

"3. Thou shalt have no other gods before me.

"4. Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water under the earth:

"5. Thou shalt not bow down thyself to them, nor serve them: . . ."

[2] *Leoles* v. *Landers*, 302 U. S. 656; *Hering* v. *State Board of Education*, 303 U. S. 624; *Gabrielli* v. *Knickerbocker*, 306 U. S. 621; *Johnson* v. *Deerfield*, 306 U. S. 621; 307 U. S. 650. Compare *New York* v. *Sandstrom*, 279 N. Y. 523; 18 N. E. 2d 840; *Nicholls* v. *Mayor and School Committee of Lynn*, 7 N. E. 2d 577 (Mass.).

upon sincere religious grounds, infringes without due process of law the liberty guaranteed by the Fourteenth Amendment.

Centuries of strife over the erection of particular dogmas as exclusive or all-comprehending faiths led to the inclusion of a guarantee for religious freedom in the Bill of Rights. The First Amendment, and the Fourteenth through its absorption of the First, sought to guard against repetition of those bitter religious struggles by prohibiting the establishment of a state religion and by securing to every sect the free exercise of its faith. So pervasive is the acceptance of this precious right that its scope is brought into question, as here, only when the conscience of individuals collides with the felt necessities of society.

Certainly the affirmative pursuit of one's convictions about the ultimate mystery of the universe and man's relation to it is placed beyond the reach of law. Government may not interfere with organized or individual expression of belief or disbelief. Propagation of belief— or even of disbelief—in the supernatural is protected, whether in church or chapel, mosque or synagogue, tabernacle or meeting-house. Likewise the Constitution assures generous immunity to the individual from imposition of penalties for offending, in the course of his own religious activities, the religious views of others, be they a minority or those who are dominant in government. *Cantwell* v. *Connecticut, ante,* p. 296.

But the manifold character of man's relations may bring his conception of religious duty into conflict with the secular interests of his fellow-men. When does the constitutional guarantee compel exemption from doing what society thinks necessary for the promotion of some great common end, or from a penalty for conduct which appears dangerous to the general good? To state the

problem is to recall the truth that no single principle can answer all of life's complexities. The right to freedom of religious belief, however dissident and however obnoxious to the cherished beliefs of others—even of a majority—is itself the denial of an absolute. But to affirm that the freedom to follow conscience has itself no limits in the life of a society would deny that very plurality of principles which, as a matter of history, underlies protection of religious toleration. Compare Mr. Justice Holmes in *Hudson Water Co.* v. *McCarter,* 209 U. S. 349, 355. Our present task, then, as so often the case with courts, is to reconcile two rights in order to prevent either from destroying the other. But, because in safeguarding conscience we are dealing with interests so subtle and so dear, every possible leeway should be given to the claims of religious faith.

In the judicial enforcement of religious freedom we are concerned with a historic concept. See Mr. Justice Cardozo in *Hamilton* v. *Regents,* 293 U. S. at 265. The religious liberty which the Constitution protects has never excluded legislation of general scope not directed against doctrinal loyalties of particular sects. Judicial nullification of legislation cannot be justified by attributing to the framers of the Bill of Rights views for which there is no historic warrant. Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs.[3] The mere possession of religious convictions

---

[3] Compare II Writings of Thomas Jefferson (Ford ed.) p. 102; 3 Letters and Other Writings of James Madison, pp. 274, 307–308; 1 Rhode Island Colonial Records, pp. 378–80; 2 *Id.* pp. 5–6; Wiener, Roger Williams' Contribution to Modern Thought, 28 Rhode Island Historical Society Collections, No. 1; Ernst, The Political Thought of Roger Williams, chap. VII; W. K. Jordan, The Development of Religious Toleration in England, *passim.* See *Commonwealth* v. *Herr,* 229 Pa. 132; 78 A. 68.

which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities. The necessity for this adjustment has again and again been recognized. In a number of situations the exertion of political authority has been sustained, while basic considerations of religious freedom have been left inviolate. *Reynolds* v. *United States*, 98 U. S. 145; *Davis* v. *Beason*, 133 U. S. 333; *Selective Draft Law Cases*, 245 U. S. 366; *Hamilton* v. *Regents*, 293 U. S. 245. In all these cases the general laws in question, upheld in their application to those who refused obedience from religious conviction, were manifestations of specific powers of government deemed by the legislature essential to secure and maintain that orderly, tranquil, and free society without which religious toleration itself is unattainable. Nor does the freedom of speech assured by Due Process move in a more absolute circle of immunity than that enjoyed by religious freedom. Even if it were assumed that freedom of speech goes beyond the historic concept of full opportunity to utter and to disseminate views, however heretical or offensive to dominant opinion, and includes freedom from conveying what may be deemed an implied but rejected affirmation, the question remains whether school children, like the Gobitis children, must be excused from conduct required of all the other children in the promotion of national cohesion. We are dealing with an interest inferior to none in the hierarchy of legal values. National unity is the basis of national security. To deny the legislature the right to select appropriate means for its attainment presents a totally different order of problem from that of the propriety of subordinating the possible ugliness of littered streets to the free expression of opinion through distribution of handbills. Compare *Schneider* v. *State*, 308 U. S. 147.

Situations like the present are phases of the profoundest problem confronting a democracy—the problem which Lincoln cast in memorable dilemma: "Must a government of necessity be too *strong* for the liberties of its people, or too *weak* to maintain its own existence?" No mere textual reading or logical talisman can solve the dilemma. And when the issue demands judicial determination, it is not the personal notion of judges of what wise adjustment requires which must prevail.

Unlike the instances we have cited, the case before us is not concerned with an exertion of legislative power for the promotion of some specific need or interest of secular society—the protection of the family, the promotion of health, the common defense, the raising of public revenues to defray the cost of government. But all these specific activities of government presuppose the existence of an organized political society. The ultimate foundation of a free society is the binding tie of cohesive sentiment. Such a sentiment is fostered by all those agencies of the mind and spirit which may serve to gather up the traditions of a people, transmit them from generation to generation, and thereby create that continuity of a treasured common life which constitutes a civilization. "We live by symbols." The flag is the symbol of our national unity, transcending all internal differences, however large, within the framework of the Constitution. This Court has had occasion to say that ". . . the flag is the symbol of the Nation's power, the emblem of freedom in its truest, best sense. . . . it signifies government resting on the consent of the governed; liberty regulated by law; the protection of the weak against the strong; security against the exercise of arbitrary power; and absolute safety for free institutions against foreign aggression." *Halter* v. *Nebraska,* 205 U. S. 34, 43. And see

*United States* v. *Gettysburg Electric Ry. Co.*, 160 U. S. 668.[4]

The case before us must be viewed as though the legislature of Pennsylvania had itself formally directed the flag-salute for the children of Minersville; had made no exemption for children whose parents were possessed of conscientious scruples like those of the Gobitis family; and had indicated its belief in the desirable ends to be secured by having its public school children share a common experience at those periods of development when their minds are supposedly receptive to its assimilation, by an exercise appropriate in time and place and setting, and one designed to evoke in them appreciation of the nation's hopes and dreams, its sufferings and sacrifices. The precise issue, then, for us to decide is whether the legislatures of the various states and the authorities in a thousand counties and school districts of this country are barred from determining the appropriateness of various means to evoke that unifying sentiment without which there can ultimately be no liberties, civil or religious.[5] To stigmatize legislative judgment in providing for this universal gesture of respect for the symbol of our national life in the setting of the common school as a lawless inroad on that freedom of conscience which the Constitution protects, would amount to no less than the pronouncement of pedagogical and psychological dogma in a field where courts possess no marked and certainly no

[4] For the origin and history of the American flag, see 8 Journals of the Continental Congress, p. 464; 22 *Id.*, pp. 338–40; Annals of Congress, 15th Cong., 1st Sess., Vol. 1, pp. 566 *et seq.; Id.*, Vol. 2, pp. 1458 *et seq.*

[5] Compare Balfour, Introduction to Bagehot's English Constitution, p. XXII; Santayana, Character and Opinion in the United States, pp. 110–11.

controlling competence. The influences which help toward a common feeling for the common country are manifold. Some may seem harsh and others no doubt are foolish. Surely, however, the end is legitimate. And the effective means for its attainment are still so uncertain and so unauthenticated by science as to preclude us from putting the widely prevalent belief in flag-saluting beyond the pale of legislative power. It mocks reason and denies our whole history to find in the allowance of a requirement to salute our flag on fitting occasions the seeds of sanction for obeisance to a leader.

The wisdom of training children in patriotic impulses by those compulsions which necessarily pervade so much of the educational process is not for our independent judgment. Even were we convinced of the folly of such a measure, such belief would be no proof of its unconstitutionality. For ourselves, we might be tempted to say that the deepest patriotism is best engendered by giving unfettered scope to the most crochety beliefs. Perhaps it is best, even from the standpoint of those interests which ordinances like the one under review seek to promote, to give to the least popular sect leave from conformities like those here in issue. But the courtroom is not the arena for debating issues of educational policy. It is not our province to choose among competing considerations in the subtle process of securing effective loyalty to the traditional ideals of democracy, while respecting at the same time individual idiosyncrasies among a people so diversified in racial origins and religious allegiances. So to hold would in effect make us the school board for the country. That authority has not been given to this Court, nor should we assume it.

We are dealing here with the formative period in the development of citizenship. Great diversity of psychological and ethical opinion exists among us concerning the best way to train children for their place in society. Be-

cause of these differences and because of reluctance to permit a single, iron-cast system of education to be imposed upon a nation compounded of so many strains, we have held that, even though public education is one of our most cherished democratic institutions, the Bill of Rights bars a state from compelling all children to attend the public schools. *Pierce* v. *Society of Sisters,* 268 U. S. 510. But it is a very different thing for this Court to exercise censorship over the conviction of legislatures that a particular program or exercise will best promote in the minds of children who attend the common schools an attachment to the institutions of their country.

What the school authorities are really asserting is the right to awaken in the child's mind considerations as to the significance of the flag contrary to those implanted by the parent. In such an attempt the state is normally at a disadvantage in competing with the parent's authority, so long—and this is the vital aspect of religious toleration—as parents are unmolested in their right to counteract by their own persuasiveness the wisdom and rightness of those loyalties which the state's educational system is seeking to promote. Except where the transgression of constitutional liberty is too plain for argument, personal freedom is best maintained—so long as the remedial channels of the democratic process remain open and unobstructed [6]—when it is ingrained in a people's habits and not enforced against popular policy by the coercion of adjudicated law. That the flag-salute is an allowable portion of a school program for those who do not invoke conscientious scruples is surely not debatable. But for us to insist that, though the ceremony may be required, exceptional immunity must be

[6] In cases like *Fiske* v. *Kansas,* 274 U. S. 380; *De Jonge* v. *Oregon,* 299 U. S. 353; *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496, and *Schneider* v. *State,* 308 U. S. 147, the Court was concerned with restrictions cutting off appropriate means through which, in a free society, the processes of popular rule may effectively function.

given to dissidents, is to maintain that there is no basis for a legislative judgment that such an exemption might introduce elements of difficulty into the school discipline, might cast doubts in the minds of the other children which would themselves weaken the effect of the exercise.

The preciousness of the family relation, the authority and independence which give dignity to parenthood, indeed the enjoyment of all freedom, presuppose the kind of ordered society which is summarized by our flag. A society which is dedicated to the preservation of these ultimate values of civilization may in self-protection utilize the educational process for inculcating those almost unconscious feelings which bind men together in a comprehending loyalty, whatever may be their lesser differences and difficulties. That is to say, the process may be utilized so long as men's right to believe as they please, to win others to their way of belief, and their right to assemble in their chosen places of worship for the devotional ceremonies of their faith, are all fully respected.

Judicial review, itself a limitation on popular government, is a fundamental part of our constitutional scheme. But to the legislature no less than to courts is committed the guardianship of deeply-cherished liberties. See *Missouri, K. & T. Ry. Co.* v. *May,* 194 U. S. 267, 270. Where all the effective means of inducing political changes are left free from interference, education in the abandonment of foolish legislation is itself a training in liberty. To fight out the wise use of legislative authority in the forum of public opinion and before legislative assemblies rather than to transfer such a contest to the judicial arena, serves to vindicate the self-confidence of a free people.[7]

*Reversed.*

---

[7] It is to be noted that the Congress has not entered the field of legislation here under consideration.

Mr. Justice McReynolds concurs in the result.

Mr. Justice Stone, dissenting:

I think the judgment below should be affirmed.

Two youths, now fifteen and sixteen years of age, are by the judgment of this Court held liable to expulsion from the public schools and to denial of all publicly supported educational privileges because of their refusal to yield to the compulsion of a law which commands their participation in a school ceremony contrary to their religious convictions. They and their father are citizens and have not exhibited by any action or statement of opinion, any disloyalty to the Government of the United States. They are ready and willing to obey all its laws which do not conflict with what they sincerely believe to be the higher commandments of God. It is not doubted that these convictions are religious, that they are genuine, or that the refusal to yield to the compulsion of the law is in good faith and with all sincerity. It would be a denial of their faith as well as the teachings of most religions to say that children of their age could not have religious convictions.

The law which is thus sustained is unique in the history of Anglo-American legislation. It does more than suppress freedom of speech and more than prohibit the free exercise of religion, which concededly are forbidden by the First Amendment and are violations of the liberty guaranteed by the Fourteenth. For by this law the state seeks to coerce these children to express a sentiment which, as they interpret it, they do not entertain, and which violates their deepest religious convictions. It is not denied that such compulsion is a prohibited infringement of personal liberty, freedom of speech and religion, guaranteed by the Bill of Rights, except in so far as it may be justified and supported as a proper exercise of the state's power over public education. Since the state,

in competition with parents, may through teaching in the public schools indoctrinate the minds of the young, it is said that in aid of its undertaking to inspire loyalty and devotion to constituted authority and the flag which symbolizes it, it may coerce the pupil to make affirmation contrary to his belief and in violation of his religious faith. And, finally, it is said that since the Minersville School Board and others are of the opinion that the country will be better served by conformity than by the observance of religious liberty which the Constitution prescribes, the courts are not free to pass judgment on the Board's choice.

Concededly the constitutional guaranties of personal liberty are not always absolutes. Government has a right to survive and powers conferred upon it are not necessarily set at naught by the express prohibitions of the Bill of Rights. It may make war and raise armies. To that end it may compel citizens to give military service, *Selective Draft Law Cases,* 245 U. S. 366, and subject them to military training despite their religious objections. *Hamilton* v. *Regents,* 293 U. S. 245. It may suppress religious practices dangerous to morals, and presumably those also which are inimical to public safety, health and good order. *Davis* v. *Beason,* 133 U. S. 333. But it is a long step, and one which I am unable to take, to the position that government may, as a supposed educational measure and as a means of disciplining the young, compel public affirmations which violate their religious conscience.

The very fact that we have constitutional guaranties of civil liberties and the specificity of their command where freedom of speech and of religion are concerned require some accommodation of the powers which government normally exercises, when no question of civil liberty is involved, to the constitutional demand that those liberties be protected against the action of govern-

ment itself. The state concededly has power to require and control the education of its citizens, but it cannot by a general law compelling attendance at public schools preclude attendance at a private school adequate in its instruction, where the parent seeks to secure for the child the benefits of religious instruction not provided by the public school. *Pierce* v. *Society of Sisters,* 268 U. S. 510. And only recently we have held that the state's authority to control its public streets by generally applicable regulations is not an absolute to which free speech must yield, and cannot be made the medium of its suppression, *Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, 514, *et seq.,* any more than can its authority to penalize littering of the streets by a general law be used to suppress the distribution of handbills as a means of communicating ideas to their recipients. *Schneider* v. *State,* 308 U. S. 147.

In these cases it was pointed out that where there are competing demands of the interests of government and of liberty under the Constitution, and where the performance of governmental functions is brought into conflict with specific constitutional restrictions, there must, when that is possible, be reasonable accommodation between them so as to preserve the essentials of both and that it is the function of courts to determine whether such accommodation is reasonably possible. In the cases just mentioned the Court was of opinion that there were ways enough to secure the legitimate state end without infringing the asserted immunity, or that the inconvenience caused by the inability to secure that end satisfactorily through other means, did not outweigh freedom of speech or religion. So here, even if we believe that such compulsions will contribute to national unity, there are other ways to teach loyalty and patriotism which are the sources of national unity, than by compelling the pupil to affirm that which he does not believe and by

commanding a form of affirmance which violates his religious convictions. Without recourse to such compulsion the state is free to compel attendance at school and require teaching by instruction and study of all in our history and in the structure and organization of our government, including the guaranties of civil liberty which tend to inspire patriotism and love of country. I cannot say that government here is deprived of any interest or function which it is entitled to maintain at the expense of the protection of civil liberties by requiring it to resort to the alternatives which do not coerce an affirmation of belief.

The guaranties of civil liberty are but guaranties of freedom of the human mind and spirit and of reasonable freedom and opportunity to express them. They presuppose the right of the individual to hold such opinions as he will and to give them reasonably free expression, and his freedom, and that of the state as well, to teach and persuade others by the communication of ideas. The very essence of the liberty which they guaranty is the freedom of the individual from compulsion as to what he shall think and what he shall say, at least where the compulsion is to bear false witness to his religion. If these guaranties are to have any meaning they must, I think, be deemed to withhold from the state any authority to compel belief or the expression of it where that expression violates religious convictions, whatever may be the legislative view of the desirability of such compulsion.

History teaches us that there have been but few infringements of personal liberty by the state which have not been justified, as they are here, in the name of righteousness and the public good, and few which have not been directed, as they are now, at politically helpless minorities. The framers were not unaware that under the system which they created most governmental cur-

tailments of personal liberty would have the support of a legislative judgment that the public interest would be better served by its curtailment than by its constitutional protection. I cannot conceive that in prescribing, as limitations upon the powers of government, the freedom of the mind and spirit secured by the explicit guaranties of freedom of speech and religion, they intended or rightly could have left any latitude for a legislative judgment that the compulsory expression of belief which violates religious convictions would better serve the public interest than their protection. The Constitution may well elicit expressions of loyalty to it and to the government which it created, but it does not command such expressions or otherwise give any indication that compulsory expressions of loyalty play any such part in our scheme of government as to override the constitutional protection of freedom of speech and religion. And while such expressions of loyalty, when voluntarily given, may promote national unity, it is quite another matter to say that their compulsory expression by children in violation of their own and their parents' religious convictions can be regarded as playing so important a part in our national unity as to leave school boards free to exact it despite the constitutional guarantee of freedom of religion. The very terms of the Bill of Rights preclude, it seems to me, any reconciliation of such compulsions with the constitutional guaranties by a legislative declaration that they are more important to the public welfare than the Bill of Rights.

But even if this view be rejected and it is considered that there is some scope for the determination by legislatures whether the citizen shall be compelled to give public expression of such sentiments contrary to his religion, I am not persuaded that we should refrain from passing upon the legislative judgment "as long as the remedial

channels of the democratic process remain open and unobstructed." This seems to me no less than the surrender of the constitutional protection of the liberty of small minorities to the popular will. We have previously pointed to the importance of a searching judicial inquiry into the legislative judgment in situations where prejudice against discrete and insular minorities may tend to curtail the operation of those political processes ordinarily to be relied on to protect minorities. See *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152, note 4. And until now we have not hesitated similarly to scrutinize legislation restricting the civil liberty of racial and religious minorities although no political process was affected. *Meyer* v. *Nebraska*, 262 U. S. 390; *Pierce* v. *Society of Sisters, supra; Farrington* v. *Tokushige*, 273 U. S. 284. Here we have such a small minority entertaining in good faith a religious belief, which is such a departure from the usual course of human conduct, that most persons are disposed to regard it with little toleration or concern. In such circumstances careful scrutiny of legislative efforts to secure conformity of belief and opinion by a compulsory affirmation of the desired belief, is especially needful if civil rights are to receive any protection. Tested by this standard, I am not prepared to say that the right of this small and helpless minority, including children having a strong religious conviction, whether they understand its nature or not, to refrain from an expression obnoxious to their religion, is to be overborne by the interest of the state in maintaining discipline in the schools.

The Constitution expresses more than the conviction of the people that democratic processes must be preserved at all costs. It is also an expression of faith and a command that freedom of mind and spirit must be preserved, which government must obey, if it is to adhere to that justice and moderation without which no free govern-

ment can exist.   For this reason it would seem that legislation which operates to repress the religious freedom of small minorities, which is admittedly within the scope of the protection of the Bill of Rights, must at least be subject to the same judicial scrutiny as legislation which we have recently held to infringe the constitutional liberty of religious and racial minorities.

With such scrutiny I cannot say that the inconveniences which may attend some sensible adjustment of school discipline in order that the religious convictions of these children may be spared, presents a problem so momentous or pressing as to outweigh the freedom from compulsory violation of religious faith which has been thought worthy of constitutional protection.