JOHNSON *v.* STATE.

4262                     163 S. W. 2d 153

Opinion delivered June 8, 1942.

*Mills & Mills* and *Shouse & Shouse,* for appellant.

*Jack Holt,* Attorney General and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

HOLT, J. On information charging that appellant, Joe Johnson, "did unlawfully, willfully and publicly exhibit contempt for the flag of the United States," he was tried, convicted and his punishment assessed at "a fine of $50 and imprisonment in the county jail for a period of 24 hours." For reversal here, appellant alleges that the evidence was not sufficient to warrant his conviction and that the trial court erred in refusing to so instruct the jury in accordance with instruction No. 1 requested by appellant.

Section 2941 of Pope's Digest, upon which the information was based, provides in part "Whoever . . . shall in any manner . . . or by word or act publicly exhibit contempt for the flag . . . of the United States . . . shall be deemed guilty of a misdemeanor and on conviction shall be punished by a fine not exceeding $100, or imprisonment for not more than thirty days, or both."

The evidence, upon which the jury found appellant guilty, is to the following effect:

Mrs. Nell Cooper was in charge of the Welfare Commissary at Marshall, Arkansas, when appellant came to procure commodities for himself, his wife and eight children. We quote the following from her testimony: "He came in the commissary on the first day of the period, and we had quite a crowd in there, and I had been told that he was drawing for more people than he really had in family, and also that he wouldn't salute the American flag, and I first asked him about a rumor that he was drawing for more than he had members in his family, and he says, 'That is just talk, I do have that many.' I thought it was hardly possible he would say he had more than he had, and I didn't give much faith to the rumor.

478

And I says, 'It is also rumored that you don't believe in saluting the flag. Is there anything in that?' And I didn't demand. I asked him—merely requested him. I says, 'Just to quiet the rumor, salute that flag.' And he said he would die before he would, and turned to the people there and says, 'You can't get anything here unless you salute the flag. It don't have eyes and can't see, and has no ears and can't hear, and no mouth and can't talk,' and says, 'It doesn't mean anything to me. It is only a rag.' And I says, 'You can't talk that way here.' And he kept on talking, and I first told him I would call one of the boys and ask him to be put out, but he left. . . . He was addressing the other people who were waiting for commodities. . . . When I asked him— I didn't demand, but I asked him—he turned and walked directly under the flag, and was facing the people outside. . . . I don't know whether he touched it or not, but his hand was in touching distance of the flag, and he reached toward the flag. . . . It wasn't any higher than his head. . . . I know who was in the commissary. I was angry, and I couldn't say who was there at the time.''

Ogle Horton testified (quoting from appellant's reply brief): ''I didn't understand all the conversation. He got under the flag and reached up and got hold of it and says, 'It don't mean anything to me. It's got no eyes and can't see, no ears and can't hear, no mouth and can't speak.''

Appellant testified: ''The Bible says not to bow to anything up in the Heaven or on the earth or in the earth, or anywhere. We are supposed to bow to God and God only. . . . It says in the Bible not to even salute your friend, but to call him by name, says, 'Claim thy friend by name.' '' It was his conviction that to salute the flag or any other like emblem would be contrary to the Bible. He did not show disrespect for the flag. ''I believe in everything it stands for.'' He denied that he had spoken disrespectfully of the flag or had exhibited contempt for it in any manner.

The trial court very clearly and properly instructed the jury that appellant could not be convicted for refusing to salute the flag of the United States; that he was within his constitutional rights to refuse to salute the flag if he did not desire to do so. Appellant's instruction No. 2 given by the court is in this language:

"You are instructed that before you can find the defendant guilty under this charge, you must find from the evidence and beyond a reasonable doubt that he did or said something or some things in an affirmative sense, manifesting a contempt for the flag; it is not sufficient that he merely refused or failed to salute the flag when directed to do so by the prosecuting witness, Mrs. Cooper, or failed or refused to do any other thing directed by her. To constitute the crime with which he is charged required some voluntary action or statement on his part in contempt of the flag."

The question, therefore, presented here is not whether appellant was within his constitutional rights in refusing to salute the flag, but did the evidence warrant the jury in finding the appellant guilty of "publicly exhibiting contempt for the United States flag" in violation of the provisions of the statute, *supra*.

It seems to us that it would be difficult to imagine a state of facts under which contempt for the flag could be more convincingly demonstrated in public than in the circumstances here. The strange and unnatural conduct of this man at the very time he was receiving, from the hands of a most generous government, supplies to aid him in sustaining a large family, may not be explained away on the grounds of ignorance or religious beliefs. It is one thing to be given the privilege of refusing to salute the flag, but quite another when one by word or act publicly exhibits contempt for the flag. Here appellant after refusing to salute the flag, as was his privilege, proceeded to address a large number of people and tell them that the flag meant nothing to him and was only a "rag." Webster's dictionary defines "rag" as "A waste piece of cloth torn or cut off, a shred or tatter,

something resembling or suggesting a rag or rags and considered of little worth or service;—used *contemptuously,* jocularly, or ironically as of a *flag,* newspaper, etc." We think appellant's statement clearly evinces contempt for the flag within the terms of the statute in question.

The Supreme Court of the United States in *Minersville School District* v. *Gobitis,* 310 U. S. 586, 60 S. Ct. 1010, 84 L. Ed. 1375, 27 A. L. R. 1419, recently said: "The flag is the symbol of our national unity, transcending all internal differences, however large, within the framework of the Constitution. This court has had occasion to say that '. . . the flag is the symbol of the Nation's power, the emblem of freedom in its truest, best sense. . . ; it signifies government resting on the consent of the governed; liberty regulated by law; the protection of the weak against the strong; security against the exercise of arbitrary power; and absolute safety for free institutions against foreign aggression.' *Halter* v. *Nebraska,* 205 U. S. 34, 51 L. Ed. 696, 27 S. Ct. 419, 10 Ann. Cas. 525.

. . .

"The religious liberty which the Constitution protects has never excluded legislation of general scope not directed against doctrinal loyalties of particular sects. Judicial nullification of legislation cannot be justified by attributing to the framers of the Bill of Rights views for which there is no historic warrant. Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities . . . ."

It is our view on the testimony presented that appellant has violated the plain terms of the statute in question and the jury was warranted in finding him guilty as charged. Accordingly the judgment is affirmed.

GRIFFIN SMITH, C. J., (dissenting). The conduct engaged in by Johnson, and adjudged violative of § 2941, occurred in June, 1941—six months before the attack on Pearl Harbor. Act 64, from which § 2941 is taken, was approved February 10, 1919. Its title discloses a praiseworthy design to prevent desecration, mutilation, or improper use of the flag.

The legislature of 1919 was the first to convene after World War No. 1 had been concluded. Memories of multitudinous tragedies between April 6, 1917, and November 11, 1918, were living images. It was natural that realism of war would amalgamate with the fervor of peace when members of the Forty-second general assembly convened in Little Rock to plan the economy of a world they thought had been made safe for democracy. Nor was it inappropriate that a commonwealth whose sons had distinguished themselves should promulgate the law with which we are now concerned. Chateau Thierry, Vaux, Belleau Woods, Argonne plateaus, and other battlefields in France were not to be forgotten.

. . . .

When congress responded to President Wilson's demand for action against the aggressor, appellant was seventeen years of age. He endeavored to enlist in the armed forces, but was prevented by his mother from doing so. From Louisiana he moved to El Dorado, then to Texas, and finally settled near St. Joe, in Searcy county, where he has been for three years. Johnson owns a 39-acre tract of land. In addition to his wife there are eight children—a family of ten. The oldest is fourteen; the youngest, two. Appellant had not been arrested prior to the present difficulty. In June, 1941, he was not a Jehovah's Witness, although shortly thereafter affiliation was made.

Nell Cooper, upon whose complaint Johnson was convicted, was the principal witness. To some extent she was corroborated by Horton. Mrs. Cooper had been "hearing rumors." Some related to appellant's patriotism, or "loyalty," as she expressed it; others had to do with a suspicion that Johnson was dividing donated groceries

with Jehovah's Witnesses. When asked whether she had instructions from any superior officer ". . . not to let Jehovah's Witnesses have commodities unless they saluted the flag," Mrs. Cooper replied: "No cult was named. They were sworn by affidavits that you wouldn't receive any unless they were a loyal American citizen." There was the further question:—"Did you receive instructions that you would have the right to require anybody to salute the flag before you would give the commodities out?" Answer:—"It might be that I overstepped in asking him to salute. We were sworn not to give to anyone who wasn't a loyal American citizen. I think saluting the flag comes under being a loyal American citizen."

The situation seems to have been this: Mrs. Cooper had certain beliefs regarding loyalty. Saluting the flag was evidence of patriotism. The jury, without objection, was permitted to be told what this witness thought Act 64 applied to, as distinguished from the court's instructions regarding the law; and she assumed the burden of dissipating or confirming the disquieting stories gossip had conveyed. According to Mrs. Cooper, she said to appellant:—"To quiet the rumor, there is the flag: let's see you salute it." Appellant is alleged to have asserted he would die before complying. To other welfare clients, appellant is charged with having said: "You can't get anything here unless you salute the flag. It doesn't have eyes, and can't see; it doesn't have ears, and can't hear; it has no mouth, and can't talk: it doesn't mean anything to me, it is only a rag." [1]

A question asked on direct examination was:—"Tell the jury, if you can, what his demeanor and tone of voice were." Answer:—"Just as though he were delivering an oration." [2]

---

[1] In making the so-called speech, appellant stood in the doorway, or near it, ". . . over which the flag hung."

[2] Ogle Horton, WPA commissary clerk, testified appellant's words were:—"Gentlemen, you can't get your commodities unless you salute this flag. It is nothing but a piece of rag. I don't believe in anything: I don't believe in any kind of church." On cross-examination the witness added that appellant said:—"I don't believe in any church, and I thank God for that. . . . He made those assertions in very harsh words."

Mrs. Cooper and Horton testified that the language they quoted was all appellant said.

Johnson testified that at the time the trouble occurred he had been studying literature published by Jehovah's Witnesses and comparing it with the Bible. He had concluded it was not right "in the sight of God" to salute the flag.

Psalm 115 was appellant's authority:—"Not unto us, O Lord, not unto us, but unto thy name give glory, for Thy mercy, and for thy truth's sake. Wherefore should the heathen say, where is now their God. But our God is in the heavens: he hath done whatsoever he hath pleased. Their idols are silver and gold, the work of man's hands. They have mouths, but they speak not: eyes they have, but they see not. They have ears, but they hear not, noses have they, but they smell not. They have hands, but they handle not: feet have they, but they walk not. . . ."

Interpreting the psalm and other biblical authority, appellant thought he was commanded to bow to God and to God only:—"That was my sincere belief. The Bible says not to even salute your friend, but to call him only by name. It says, 'Claim thy friend by name.'

"It was my conviction that to salute the flag or any other like emblem would be contrary to the Bible. I did not show disrespect for the flag. I believe in everything it stands for. I was born in this country and have always lived here, and I am in sympathy with our form of government and its laws. I love the laws of this country and love to obey them, and I appreciate our land.

"The morning this trouble came up I went to the commissary early. Several people were sitting around. Mrs. Cooper was not there. She soon came and went in. I went to her desk and asked if my commodity slip had run out. She asked, 'Are you taking these groceries to these Jehovah's Witnesses?' I told her I was not: that I was only drawing for the actual members of my family. I didn't have time to fully answer her. I about halfway shook my head. Before I had time to finish she said, 'Prove yourself and salute the flag.' It stunned me so that I just stood there. She again said, 'Prove whether

you are a Jehovah's Witness or not.' I told her I wouldn't salute the flag. I walked to the door and pulled off my hat and made a little speech. I didn't want to talk to the lady: some of them make things bigger than they are. I said, 'This flag means as much to me as to you. My fore-fathers died for it the same as yours.' . . . I do not recall saying the flag didn't mean anything to me, because it does. It means all to me, [but] it hasn't any life or being, [such] as a God. . . . I was not angry at Mrs. Cooper. Her statement surprised me and shocked me—like going out a door and having somebody throw a bucket of water on you.'' [3]

. . . .

It is clear that the controversy into which appellant was drawn had its inception in Mrs. Cooper's assumption that she had a right to require those whom she conceived to be on the shady side of patriotism to make profert of some loyal act, the nature of which should satisfy the tension of her emotion. The colloquy bore but slight resemblance to ''the feast of reason and the flow of soul.'' She must have thought that somewhere in the decalogue of things prohibited and things commanded it was requisite that those receiving bread in consequence of government bounty should stand at attention when so directed.

Of course Mrs. Cooper was entirely sincere; yet, however meritorious her meaning may have been, it is easy to understand that a person who at the time was sympathetic with a minority group, (and who later became affiliated) would react somewhat unnaturally. I do not agree with appellant's point of view. To me it is mawkish. My disagreement with the court's majority is in ascertaining appellant's purpose. *The statute is intended to prevent a person, by word or act, from publicly exhibiting contempt for the flag.* Johnson's aversion was not to the flag. His conduct was based upon his religious belief; and while to me it appears vapid, to him it was real. The Bible, he said, contains pronouncements against

---

[3] W. E. Tharp, witness for appellant, testified that Johnson said: —"This flag means as much to me as anybody else. My forefathers fought for the flag. It doesn't smell, taste, talk, nor walk." Concluding, Tharp said:—"That is all I heard Johnson say. Mrs. Cooper told him to leave the premises, and he did so."

bowing to graven images. Appellant's idea was that any act of obeisance, any deference, any homage to that which was without eyes to see with, without ears to hear with, without a mouth to taste with, and without a nose to smell with, was forbidden by holy writ.

. . . .

Conscientious objectors are excused from combat military service. A great hero of 1918, even after being drafted, for a time held doggedly to the conception that the Bible banned war: yet when Sergeant York became convinced that national safety was threatened he used rifle and pistol with deadly effect.

. . . .

Contempt, as defined by Webster's New International Dictionary, is the feeling with which one regards that which is esteemed mean, vile, or worthless; an act of contemning, or despising.

An impulsive declaration by one suddenly confused or confounded that the flag means nothing to him (assuming, for the purpose of this discussion, that appellant made such comment) is at most a method of emphasizing ignorance. If to the remark is coupled the further assertion that appellant characterized Old Glory as a rag, still consideration must be given the undisputed evidence that in thus designating the object of controversy appellant modified his meaning with the explanation that because the flag was something inanimate he could not bow down and worship it.

It is a strange philosophy—if appellant's belief may be dignified by that term—which blunts a citizen's patriotic sensibilities when in the presence of his country's emblem, or dulls his comprehension of its status.[4]

In spite of my own lack of sympathy with appellant's attitude, irrespective of an entrenched belief that a country would not endure if peopled by men entertaining the

---

[4] General Sir E. Hamley, referring to the colors of the Forty-third Monmouth Light Infantry, wrote:
"A moth-eaten rag on a worm-eaten pole,
It does not look likely to stir a man's soul.
'Tis the deeds that were done 'neath the moth-eaten rag,
When the pole was a staff, and the rag was a flag."

ideas appellant expounded as interpreted by the state, the fact remains that we are engaged not only in a war of men, machines, and materials, but in a contest wherein liberty may be lost if we succumb to the ideologies of those who enforce obedience through fear, and who would write loyalty with a bayonet.

Amendment No. 1 to the federal constitution prohibits congress from making any law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

By § 6, art. 2, those who framed the state constitution of 1874 wrote that liberty of the press should forever remain inviolate, and "The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, being responsible for the abuse of such right." I think that under the "responsibility" provision of § 6 the general assembly was authorized to prohibit a citizen from engaging in conduct which shows public contempt for the flag, but I do not believe that in the circumstances of this case it was appellant's intention to do so.

December 10, 1941, Attorney General Francis Biddle said: "The United States is now at war. Every American will share in the task of defending our country. It is essential at such a time that we keep our heads, keep our tempers—above all, that we keep clearly in mind what we are defending. The enemy has attacked more than the soil of America. He has attacked our institutions, our freedoms, the principles on which this nation was founded and has grown to greatness. Every American must remember that the war we wage today is in defense of these principles. It therefore behooves us to guard most zealously these principles at home."

In his address December 15, 1941, President Roosevelt declared "We will not under any threat or in the face of danger surrender the guarantees of liberty our

forefathers framed for us in the Bill of Rights. We hold with all the passion of our hearts and minds to those commitments of the human spirit."

In June, 1920, Charles Evans Hughes, in an address at Harvard Law School, referring to hysteria that followed the last war, asserted: "We may well wonder, in view of the precedents now established, whether constitutional government as heretofore maintained in this republic, could survive another great war even victoriously waged."

The noble utterances of President Wilson at the beginning of our war with Germany are clearly recalled:— "An unwillingness even to discuss these matters produces only dissatisfaction and gives comfort to the extreme elements in our country which endeavor to stir up disturbances in order to provoke governments to embark upon a course of retaliation and repression. *The seed of revolution is repression.*"

Referring to prosecutions under the Espionage Act of 1917, Judge Amidon said: "Only those who have administered the Espionage Act can understand the danger of such legislation. When crimes are defined by such generic terms, instead of by specific acts, the jury becomes the sole judge, whether men shall or shall not be punished. Most of the jurymen have sons in the war. They are all under the power of the passions which war engenders. For the first six months after June 15, 1917, I tried war cases before jurymen who were candid, sober, intelligent business men, whom I had known for thirty years, and who under ordinary circumstances would have had the highest respect for my declarations of law, but during that period they looked back into my eyes with the savagery of wild animals, saying by their manner, 'Away with this twaddling, let us get at him.' Men believed during that period that the only verdict in a war case, which could show loyalty, was a verdict of guilty."

Madison once remarked, in discussing tendencies of governmental encroachment:—"It is proper to take alarm at the first experiment upon our liberties. We hold this prudent jealousy to be the first duty of citizens and

one of the noblest characteristics of the late revolution. The freemen of America did not wait until usurped power had strengthened itself by exercise and entangled the question in precedents. They saw all the consequences in the principle and they avoided the consequences by denying the principle. We revere this lesson too much, soon to forget it."

An excerpt from "Democracy in Government," by John J. Parker, senior United States circuit judge, Fourth district, is well worth repeated consideration. "From the standpoint of the happiness of the individual, as well as from that of the development of the life of society," says Judge Parker, "no rights of the individual are more important than those relating to the free expression of personality, by which I mean freedom of religion, freedom of speech, freedom of the press and freedom of assembly, all guaranteed by the first amendment to the constitution of the United States. The essential dignity of man's nature depends upon his relation to the infinite, and this depends upon his right to worship God according to the dictates of his own conscience. The free expression of his thought and the right to share that thought with others are necessary to his intellectual growth and happiness. Free expression of views . . . is necessary for the dissemination of intelligence and the correction of error. . .

"While all of these rights are of the first order of importance, I would speak particularly of freedom of speech, because it is always in danger. Truth is apprehended in the mind of the individual. Its progress is slow and fraught with difficulties; and only by free expression can it hope to gain acceptance by the majority in the community. The history of human thought is one continuous process of the triumph of ideas which upon their first expression were condemned as error by the learned and the powerful. Progress is dependent upon the advance of truth; and this in turn is dependent upon 'the right of men to give free expression to any view they may entertain. To the objection that free speech may lead to the propagation of error, the answer is that truth is able to take care of itself in a contest,

and that, in an atmosphere of freedom, error will be detected and exposed and the truth will eventually prevail. No wiser opinion was ever delivered than that of Gamaliel, who, when the teachers of Christianity were brought before him, said, 'Refrain from these men and let them alone; for if this counsel or this work be of men, it will come to naught. But if it be of God, ye cannot overthrow it.' And as John Stuart Mill has pointed out in his Essay on Liberty, even where truth is accepted, it is benefited by free expression of opposing views.''

In a dissenting opinion to *Abrams et al.* v. *United States*, 250 U. S. 616, beginning at page 624, 40 S. Ct. 17, 63 L. Ed. 1173, Mr. Justice Holmes wrote: ''. . . when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our constitution. It is an experiment, as all life is an experiment. Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge. While that experiment is part of our system I think that we should be eternally vigilant against attempt to check the expression of opinions we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is desired to save the country.'' The expressions were concurred in by Mr. Justice Brandeis.

Little more need be said regarding appellant, his conduct, and his conviction. If ignorance were a legal crime the judgment would be just. But witch-hunting is no longer sanctioned. The suspicions and hatreds of Salem have ceased. Neighbor no longer inveighs against neighbor through fear of the evil eye.

Mr. Justice MEHAFFY concurs in this dissent.