WILKINSON, Circuit Judge,
dissenting:
In a case concerning a law that requires private, noncommercial organizations to convey a government-authored message, one would expect to find at least some acknowledgement of the dangers of state-compelled speech. But one will search the majority’s opinion in vain for any such recognition. Instead, the majority opts to opine on various points of civil procedure, apparently oblivious to the fact that litigation is not an end in itself, but a means of vindicating the substantive values underlying our legal order, among which I had hitherto supposed were the freedoms of conscience and belief.
Those freedoms are at the heart of this case, though one would never know it from the majority’s opinion, which glosses over the impact of the Baltimore Ordinance on the right of the plaintiff Center not to be compelled by the state to express a message at odds with its most intimate beliefs. Today it is the Center; tomorrow it is who knows what speaker and who can guess what view. Because the majority fails to respect the Center’s right not to utter a state-sponsored message that offends its core moral and religious principles, and because it launches a litigious fusillade aimed at smothering the Center’s right to simple silence, I respectfully dissent.
I.
A.
Given the dearth of discussion about the evils of compelled speech in the majority opinion, it is worth pausing to consider what is at stake when government forces private individuals or organizations to speak on its behalf. We now take it for granted that “[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Regrettably, this constitutional star was not always so fixed. In fact, the Supreme Court had earlier upheld a law that required school children to participate in a daily flag-salute ceremony in Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940). In his opinion for the Court in Gobitis, Justice Frankfurter declared the flag-salute ceremony an essential means of fostering “[njational unity,” which, in turn, he regarded as “the basis of national security.” Id. at 595, 60 S.Ct. 1010. When opponents of a compelled flag salute protested, Justice Frankfurter retorted that forced salutes helped to inculcate “that unifying sentiment without which there can ultimately be no fiber-ties, civil or religious.” Id. at 597, 60 S.Ct. 1010.
In confusing mere statism with patriotism, Justice Frankfurter also posited a cramped conception of the freedom of speech. Specifically, he denied that the right to speak entails a right not to speak. In a lone dissent, Frankfurter reaffirmed *293 this view even as the Court reversed course and declared compulsory flag-salute laws unconstitutional. So long as a law “suppresses no belief nor curbs it,” he insisted — so long as it permits individuals to “believe what they please, avow their belief and practice it,” leaving “[a]ll channels of affirmative free expression ... open” — it does not violate the freedom of speech guaranteed by the First Amendment. Barnette, 319 U.S. at 664, 63 S.Ct. 1178 (Frankfurter, J., dissenting).
Justice Frankfurter’s opinions in the flag-salute cases mark a singular blot on a long and storied career. He simply failed to grasp a truth that had been “well known to the framers of the Bill of Rights,” id. at 633, 63 S.Ct. 1178 (majority opinion): that “[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of ‘individual freedom of mind,’ ” Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (quoting Barnette, 319 U.S. at 637, 63 S.Ct. 1178). Because government can infringe this freedom not only through naked censorship but by compelling individuals to utter words that the state wishes uttered, courts must scrutinize both kinds of regulation with the same skepticism. No American is the mere mouthpiece of the state. That is the enduring lesson of the flag-salute cases.
B.
It is a lesson the majority has failed to learn. While it perfunctorily acknowledges that laws compelling speech are “generally” subject to strict scrutiny, maj. op. at 283, it follows Justice Frankfurter in downplaying the impact of such laws on the individuals who are compelled to speak. As the majority apparently sees it, the Ordinance requires organizations like the Center to make nothing more than an anodyne factual statement identifying the services they do not provide, without having to condone those services. See maj. op. at 287-88.
But the majority utterly fails to appreciate the nature of the Center’s beliefs. The Center has “sincerely held” “moral, ideological, political, and religious beliefs” that abortion and at least some forms of birth control are profoundly wrong and thus are not to be chosen. Complaint ¶¶ 43, 40. The Ordinance requires the Center to state that it “does not provide or make referral for abortion or birth-control services.” J.A. 26. The conflict between the Center’s beliefs and the mandated disclosure is thus plain: where the Center wishes to guide women toward alternatives to abortion and birth control, the Ordinance requires it to indicate at the outset that those services are readily available, just not at the Center itself.
The flag-salute ceremony may not have compelled Jehovah’s Witnesses to affirm the American flag as an idol or the United States as a deity in so many words, but from their perspective, that was the import of the ritual. The same is true here. Although the Ordinance does not compel the Center to explicitly countenance abortion and birth control, it does compel the Center to present them as viable options— which, of course, is precisely what the Center denies they are. Putting aside altogether the matter of abortion, about which people of good will may and do differ, imagine any of us being told by the state to renounce ourselves in such a basic way.
Echoing Justice Frankfurter’s rejoinder to the Jehovah’s Witnesses in the flag-salute cases, the City responds by noting that pregnancy centers remain free to express their disapproval of abortion and birth control alongside the mandatory disclaimer. But the Supreme Court rightly found this response unavailing in Barnette, *294 and it is no more persuasive here. In each case, the speaker is put in the position of having to explain a statement made in its voice but not from its heart. Only because the Ordinance compels the Center to mention abortion and birth control in the first place must it start from a stance of opposing those options, rather than from one of simply advocating alternatives like adoption and abstinence.'
Compelled speech can be all the more pernicious because of its context. So it is here. Whether or not the Ordinance is technically viewpoint-discriminatory, this much can be said: it compels groups that oppose abortion to utter a government-authored message without requiring any comparable disclosure — or indeed any disclosure at all — from abortion providers. Seventy years after the flag-salute cases, it should be axiomatic that the First Amendment prohibits the government from dictating the terms of private expression, let alone in such a one-sided manner. Faced with the inadequacy of its reasons, the majority responds with only noise, making believe it has somehow been accused of various “improprieties,” maj. op. at 290, and “zealous” pro-choice views, id,., when the only issue in reality is that the grand neutrality at the heart of the First Amendment has been compromised. Those who support most firmly a woman’s right to reproductive choice should find it the most disheartening that the court’s First Amendment jurisprudence is trampling expressive privacy and marching backward through time.
II.
The majority would have us believe that it has issued nothing more than a cut-and-dried procedural ruling, merely ordering “essential discovery” into a few key factual questions in the case. Maj. op. at 280. Don’t be fooled. The majority is conducting an amorous affair with litigation that is anything but benign. For the infatuation here is indiscriminate. The majority neglects to pose the most relevant question: whether its enchantment with extended procedures will serve to vindicate the assertion of a constitutional right or to suffocate it. Perhaps it evades this question because the answer is so obvious. By bringing the full brunt of the litigative process to bear on the Center, the majority is imposing a high price on the Center (and by extension any speaker) for attempting to vindicate its free-speech rights.
Most troubling, the majority has licensed a fishing expedition into the Center’s motivations and operations on the off chance that it might turn up some vaguely “commercial” activity. The majority appears to recognize that the Center’s speech clearly lies far from “the core notion of commercial speech,” since none of its advertisements propose a commercial transaction. Maj. op. at 284 (quoting Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)); see United States v. United Foods, Inc., 533 U.S. 405, 409, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) (noting that commercial speech is “usually defined as speech that does no more than propose a commercial transaction”). Nevertheless, the majority believes that “discovery is needed to substantiate, inter alia, whether the Center possesses economic interests apart from its ideological motivations.” Maj. op. at 285. Not even the City had the temerity to second-guess the Center’s motives in this way. And yet, the majority displays no compunction about doing so, subjecting the Center to intrusive and burdensome discovery based on a few farfetched hypothetical regarding “the Cen *295 ter’s potential profit motives” and its “operational intricacies.” Maj. op. at 285 n. 9.
Ordering discovery on this tenuous a basis would entail delays and costs even in the ordinary case. But the delays and costs are especially onerous where, as here, the party that is subjected to discovery has so plainly suffered a violation of its constitutional rights. By encouraging the City to pry into every corner of the Center’s operations, the majority heavily penalizes this organization for attempting to defend its constitutional rights, a penalty that will only dissuade future victims of constitutional violations — and especially those who hold to the Center’s persuasion — from bringing suit in the first place. Where discovery should be a means of vindicating constitutional rights, the majority converts it into a process that strangles them.
The majority’s approach also excuses the City’s rush to regulate the Center’s speech, rather than consider other ways of achieving the purposes underlying the Ordinance. There has never been any dispute that the Ordinance forces organizations like the Center to communicate a message they would otherwise never utter. Given the dangers of compelled speech, this kind of mandated disclosure should be a last resort, not a first recourse. See Riley v. Nat’l Fed’n of the Blind of N.C., Inc., 487 U.S. 781, 800, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (noting “the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored”).
Thus, before enacting the Ordinance, the City should at least have considered less restrictive alternatives and indicated why those alternatives would be ineffective. And yet, the City points to not a single portion of the 239-page legislative history submitted as part of this litigation indicating that it ever took these elementary steps. See J.A. 192-430. What testimony was delivered and evidence presented before the City Council appears to have focused on the City’s interest in enacting the Ordinance rather than the question of whether the Ordinance was a narrowly tailored means of serving that interest. Especially telling is the absence of any statement of legislative findings indicating why less restrictive alternatives would come up short. This is not for a lack of such alternatives. As the district court noted, many suggest themselves. See O’Brien v. Mayor & City Council of Balt., 768 F.Supp.2d 804, 817 (D.Md.2011). Posting warning signs in its own voice outside the Center, undertaking a public information effort of its own, or applying the anti-fraud provisions in state law are all alternatives that the City now seems eager to reject but nowhere indicates it ever considered or tried.
Without ever having contemplated these options, the City now asserts that they will prove ineffective, and based on that bald assertion, the majority unlocks the doors of discovery. The lesson of the majority’s ruling for other legislative bodies is clear: compel speech before considering less restrictive alternatives, and you will be granted discovery to prove why those alternatives are ineffective after the fact. This upends the notion that compelled speech should be a last resort, encouraging legislatures to adopt the most constitutionally offensive option rather than the least. In this respect as well, the majority renders litigation a threat to liberty rather than its safeguard.
The majority’s infatuation with discovery is compounded by its similarly misguided affection for as-applied challenges. Although the district court construed the Center’s claim as a facial challenge, the majority insists it actually undertook an *296 as-applied analysis. See maj. op. at 281-82. But this conclusion, aside from being incorrect, is a tragedy for free expression. For it means that, even if the Center ultimately prevails on its First Amendment claim, other centers with similar moral or religious beliefs will each have to bring their own suits challenging the Ordinance as applied to them. This is a war of attrition. By requiring every pregnancy center to bring its own as-applied challenge and to submit to separate investigation, the majority invites piecemeal litigation that will dramatically increase the costs for the centers of vindicating their First Amendment rights. Free speech should never be held hostage to this kind of duplicative and intrusive litigation.
The majority responds by doubling down on the virtues of extended litigation. It pens a final ode to discovery, maj. op. at 290, again ignoring the question of when that discovery serves a salutary purpose and when it simply chokes off constitutional rights as it does here. This is by no means to suggest that affording the government discovery is inappropriate in every constitutional case. But one does not need discovery to discover the obvious. Here, the infringement of the Center’s free-speech rights is patent and profound, and the alternatives to a mandatory disclaimer are myriad. I recognize that the Center’s views on the issues surrounding abortion rights are controversial. But the First Amendment is not needed to protect speech that elicits broad popular approbation. “The test of [freedom’s] substance is the right to differ as to things that touch the heart of the existing order.” Barnette, 319 U.S. at 642, 63 S.Ct. 1178. If there was ever a case for entering judgment in order to forestall government action that threatens to deter disfavored speakers from defending their First Amendment rights, this case is it.
Indeed, the Supreme Court has only recently reiterated the “basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say.” Agency for Int’l Development v. Alliance for Open Society Int’l, Inc., — U.S.—, 133 S.Ct. 2321, 2327, 186 L.Ed.2d 398 (2013) (internal quotation marks omitted). Even when direct appropriations are involved, the government may not control an organization’s core message outside of the confines of the program being funded. See id. at 2332 (holding that a government requirement that “compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program.... violates the First Amendment”). Here, of course, funding conditioned upon speech is not at issue. Compelled speech becomes all the more invasive when it is simply commanded without any corresponding benefit to the recipient. The recipient of public funds at least theoretically has some choice about whether to accept the aid with its attendant conditions. Id. at 2327-28. In the instant case, the Center gains no benefit and has no choice but to speak, and the coercion is complete.
III.
To my good colleagues in the majority, all I can say is, “Be careful what you wish for.” In strongly implying that the Ordinance will survive First Amendment scrutiny, the majority has established a principle that will bite the very hands that feed it. For compelled speech can serve a pro-life agenda for elected officials as well as a pro-choice one. Cf. Planned Parenthood Minn., N.D., S.D. v. Rounds, 686 F.3d 889 (8th Cir.2012) (en banc). It is easy to imagine legislatures with different ideological leanings from those of the Baltimore City *297 Council enacting measures that require organizations like Planned Parenthood to post a statement in their waiting rooms indicating what services they do not provide. Indeed, after today’s decision, I would expect a flurry of such measures.
When this court finally confronts a pro-life analogue of the Baltimore Ordinance, it will face a dilemma. Either it will uphold the measure, in which case it will simply confirm what today’s decision suggests: that the government does have the power after all to “prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion [and to] force citizens to confess by word or act their faith therein.” Barnette, 319 U.S. at 642, 63 S.Ct. 1178. Or it will invalidate the measure, in which case the First Amendment will have ceased to function as a neutral arbiter of our nation’s ideological disputes, but will instead have become a tool to serve the policy predilections of the judges who happen to be applying it in any given case. Either way, we will have warped First Amendment doctrine beyond recognition, and we shall have but ourselves to blame.
IV.
Compelled speech can get tricky quickly. The state possesses a broad police power to regulate for the health and safety of its citizens, which includes the authority to require the disclosure of limited amounts of accurate information. See, e.g., Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 650-53, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). Compelled speech is thus not an all-or-nothing matter. See Centro Tepeyac v. Montgomery Cnty., No. 11-1314, 722 F.3d 184, 2013 WL 3336825 (4th Cir.2013) (en banc) (Wilkinson, J., concurring). But as the flag-salute cases teach us, the state generally may not force individuals to utter statements that conflict with beliefs so profound that they define who we are. How to balance the state’s responsibility to protect its citizens with the individual’s interest in staying true to conscience is a perennial question that will prove vexing in many cases.
This case, however, is not vexing. The Baltimore Ordinance demands that organizations like the Center affirm a proposition they vehemently deny. It is, moreover, a law in search of a problem about which the City and majority speculate but cannot identify. The City made no attempt to try or even consider alternative approaches that would have allowed it to achieve its purposes without compelling the Center to say a word. Wherever the First Amendment might draw the line between state regulation and individual conscience, this law crosses it. To the infirmities of the law, the majority adds burdens beyond measure on freedom of the mind.
I respectfully dissent.